# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SALIHA MADDEN, on behalf of herself and all others similarly situated,<br><br>         Plaintiff,<br><br>     -against-<br><br>MIDLAND FUNDING, LLC and MIDLAND CREDIT MANAGEMENT, INC.<br><br>         Defendants. | Civil No.: 7:11-cv-08149 (CS) |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Thomas A. Leghorn
150 E. 42nd Street
New York, NY 10017

*Attorney for Defendants*

April 18, 2013

Defendants Midland Funding, LLC ("Midland") and Midland Credit Management, Inc. ("MCM") (collectively the "Defendants") respectfully submit this Reply Memorandum in further support of their Motion for Summary Judgment ("Motion") dismissing all claims against Defendants, with such other and further relief as this Court may deem just and proper.

## PRELIMINARY STATEMENT

Plaintiff's opposition to Defendants' Motion is premised upon baseless challenges to the evidentiary sufficiency of Defendants' moving papers and a gross mischaracterization of the applicable law. Further, the relevant case law directly refutes Plaintiff's position that a national bank must retain an interest in the assigned debt in order for the National Bank Act to apply to an assignee of its receivables. Accordingly, Plaintiff's opposition fails to raise a genuine issue of material fact. Defendants' Motion should, therefore, be granted.

## ARGUMENT

### I. The Only Evidence in the Record Establishes that Plaintiff Agreed that Delaware Interest Rates Applied to Her Account

A. <u>The Moreno Affidavit Remains Un-contradicted</u>

Mr. Moreno's affidavit in support of Defendants' Motion establishes the relevant terms and conditions agreed to by FIA and Plaintiff. (DE 31-3). Notably, Plaintiff does not—as she must—confront that substance with conflicting evidence. <u>Allen v. Cuomo</u>, 100 F.3d 253, 258 (2d Cir. 1996) ("[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case."). Rather, she merely challenges Mr. Moreno's foundation because he is "not a custodian of records for either Bank of America or FIA Card Services." (DE 42 at p. 4). But because MCM incorporated FIA's business records into its own (DE 31-3, ¶ 6), and because Mr. Moreno is qualified to testify about MCM's business records (<u>Id</u>. ¶¶ 1-2), he is also qualified to testify about the incorporated FIA records. <u>See</u> Fed. R. Evid. 803(6); <u>Brawner v. Allstate Indem.</u>

1

Co., 591 F.3d 984, 987 (8th Cir. 2010) (citing United States v. Adefehinti, 510 F.3d 319, 325-26 (D.C. Cir. 2007)); Air Land Forwarders, Inc. v. Unites States, 172 F.3d 1338, 1342-44 (Fed. Cir. 1999); United States v. Duncan, 919 F.2d 981, 986-87 (5th Cir. 1990); Resolution Trust Corp. v. Eason, 17 F.3d 1126, 1132 (8th Cir. 1994) ("custodian or other qualified witness need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information.").

Accordingly, the evidence of the terms governing Plaintiff's account remains undisputed.

B. The Undisputed Evidence Establishes FIA was a National Bank Protected by the National Bank Act at All Relevant Times

Defendants properly established that FIA is a Delaware National Bank by citing to the Office of the Comptroller of the Currency ("OCC") website. Numerous federal courts have taken judicial notice of documents (including the very document Defendants cite here) available on that same website. See Lane v. Wells Fargo Bank, N.A., 2013 U.S. Dist. LEXIS 9874 at 7 (N.D. Cal. January 24, 2013); Thach v. Bank of America, 2012 U.S. Dist. LEXIS 178387 (N.D. Cal. December 17, 2013); Miller v. Wells Fargo Home Mortg., 2010 U.S. Dist. LEXIS 89986 (E.D. Cal., Aug. 31, 2010). Plaintiff's reliance on cases holding generally that websites are not self-authenticating (DE42 at p.12) is misplaced, as none of those cases involved a government website. See Lane, 2013 U.S. Dist. LEXIS 9874 at 7 (documents "currently available on [] federal agencies' websites" are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

Defendants also established that FIA has been a Delaware national bank since the time of its inception by citing to the terms and conditions of Plaintiff's 2006 updated cardholder agreement. (DE 31-3 at pp. 4, 16, and 18). By contrast, Plaintiff has come forward with no affirmative proof that FIA is anything other than a Delaware national bank. Given the highly regulated nature of national banks, if Plaintiff's position had any merit she surely would have been able to find *some*

2

evidence to support it. But she found none, and that failure is fatal. See <u>Allen v. Cuomo</u>, 100 F.3d at 258.

    C.  <u>FIA Now Corroborates Defendants' Evidence</u>

As shown above, the evidence in support of Defendants' Motion is sufficient—and undisputed. But to allay any concerns Plaintiff or the Court may have about the evidentiary record, Defendants now offer a corroborating affidavit from an FIA Bank Officer, Debra Pellicciaro (the "FIA Affidavit"). The FIA Affidavit (annexed hereto as Exhibit A), confirms that FIA has been a Delaware National Bank since its inception, Ex. A at ¶ 3, and is a successor in interest to Bank of America, N.A. ("B of A"), the entity with which Plaintiff first opened her account on April 23, 2005. Ex. A at ¶¶ 3-4(a).

The FIA Affidavit also attaches and authenticates Plaintiff's original cardholder agreement with B of A, which was provided to Plaintiff when she first opened her account, Ex. A at ¶ 4(a). That agreement contains a provision (Section 7.14) allowing for unilateral modification of its terms upon notice thereof. Ex. A at ¶ 6; see Affidavit Exhibit B, annexed to Ex. A. The FIA Affidavit establishes that upon the merger of B of A with and into FIA, effective October 20, 2006, Ms. Madden's account became issued and administered by FIA, and the terms and conditions applicable to the account were amended. Ex. A. at ¶4(b) and ¶ 7.

Further, the FIA Affidavit confirms that the amended agreement was sent directly to Ms. Madden's attention with her August 14, 2006 account statement. Ex. A at ¶7. Thereafter, Plaintiff continued to make payments on the account for two years, until August 30, 2008, Ex. A at ¶ 8. Plaintiff's account was "charged-off" on September 30, 2008, and validly assigned to Midland on November 10, 2010. Ex. A at ¶ 4(c)-(d). As a result of the sale and assignment of Plaintiff's account, Midland (or its authorized agent) had complete authority to settle, adjust, compromise and satisfy same. Ex. A at ¶ 5.

3
5495631v.1

## II. Pursuant to the National Bank Act, the Interests Rates Allowed by Delaware Law Are Clearly the Applicable Interest Rates Herein

The National Bank Act ("NBA") "provides that a national bank may charge interest 'on any loan' at the rate allowed by the laws of the State in which the bank is 'located.'" Marquette v. First Omaha, 439 U.S. 299, 308 (1978). The Supreme Court has noted that Congressional debates surrounding the enactment of the NBA "were conducted on the assumption that a national bank was 'located' [] in the State named in its organization certificate." Id. at 310. Furthermore, a national bank "cannot be deprived of this location merely because it is extending credit to residents of a foreign State." Id.

Plaintiff attempts to create an issue of fact as to whether FIA was "located" in Delaware for purposes of the NBA by citing to Office of the Comptroller of the Currency ("OCC") Interpretive Letter No. 822 ("IL822"), and a Nassau County State District Court case, Citibank (SD) N.A. v. Hansen, 28 Misc. 3d 195 (N.Y. Dist. Ct. 2010), which purportedly follows the analysis of the letter. As a preliminary matter, IL822 is, at best, persuasive because statements of the OCC "are a matter of federal enforcement policy, not state or federal law." Hudson v. ACE Cash Express, Inc., 2002 U.S. Dist. LEXIS 11226, 13 (S.D. Ind. 2002). But even under the analysis of IL822, Plaintiff's arguments are completely unavailing.

First, IL822 is inapplicable to the facts here. It addresses "when an interstate national bank (a national bank with its main office in one state, the home state, and a branch office in another state, the host state), may charge home state interest rates on its loans." Comptroller of the Currency Interpretive Letter No. 822 [Mar. 1998] at 1. Here, the FIA Affidavit establishes that FIA's offices are located in Delaware. Ex. A. at ¶ 2. Therefore, FIA is not an interstate national bank and IL822 is inapplicable as FIA is only "located"—for NBA purposes—in Delaware.

Second, even if Plaintiff could establish that FIA maintains a branch office in some other State (which she cannot), her attempt to raise an issue of fact regarding the applicability of

4

Delaware interest rates to her agreement is without merit. In IL822, the OCC cited to the Supreme Court's decision in Marquette, 439 U.S. at 309-313, and noted that "nothing in the Marquette decision…requires that the bank must conduct certain lending activities in the home state to use the home state's rates notwithstanding the residence of the borrower." Comptroller of the Currency Interpretive Letter No. 822 [Mar. 1998] at 10. Further, an interstate national bank may always "charge interest permitted by the laws of its home state *unless* the loan is made – that is, the loan is approved, credit is extended *and* funds are disbursed – in a branch or branches of the bank in a single host state." Id. at 14. (emphasis added). Thus, in order to establish that FIA was not entitled to apply Delaware law, Plaintiff would need to show that all three non-ministerial functions described in the letter (the decision to extend credit, the extension of credit itself, and the disbursal of proceeds) were performed in a single State that is not Delaware. Id.

Here, the FIA Affidavit explicitly refutes this possibility. Indeed, it confirms that since October 20, 2006, the date Plaintiff's account was effectively issued and administered by FIA, *all* revolving credit accounts have either (1) been approved in Delaware, or (2) communicated account approval to accountholders from Delaware. Ex. A at ¶ 4(b). Thus, Plaintiff cannot establish that *any* non-ministerial act – let alone all three – was performed outside Delaware. Accordingly, Plaintiff's Complaint must be dismissed because it is predicated entirely on violations of New York anti-usury statutes, yet the undisputed evidence establishes that FIA is a Delaware national bank.

**III. The National Bank Act Clearly Applies to Assignees of a National Bank**

    A. <u>The Purpose of the National Bank Act Supports Defendants' Position</u>

In enacting the NBA, "Congress intended to facilitate [] a 'national banking system.'" Marquette at 314-315 (quoting Cong. Globe, 28th Cong., 1st Sess., 1451 (1864)). The Supreme Court has held that the role of the NBA is to "'form a system of regulations…all the parts of which are in harmony with each other and cover the entire subject,' so that 'the State law would have no

5

bearing whatever upon the case.'" Ben Nat'l Bank v. Anderson, 539 U.S. 1, 10 (quoting Farmers' and Mechanics' Nat. Bank v. Dearing, 91 U.S. 29, 32-33 (1875)).

Thus, the purpose of the NBA is to allow for "uniform rules limiting the liability of national banks and prescribing exclusive remedies for their overcharges" as "an integral part of a banking system that need[s] protection from possible unfriendly State legislation." Ben. Nat'l Bank, 539 U.S. at 10. The fact that courts have allowed loans originated by a national bank to continue, once assigned, under their agreed-upon terms, serves precisely this purpose. Indeed, here, as in other cases applying the national bank act to assignees, the assignee is merely continuing to apply the agreed-upon loan terms to an inactive account. As such, a finding that the account's terms continue to apply once the account is assigned is entirely consistent with the NBA's purpose of establishing uniform rules and exclusive remedies for overcharges.

Further, Plaintiff's argument that the NBA should not apply because New York has a "fundamental public policy" interest in applying its own usury laws is refuted by the Supremacy Clause of the U.S. Constitution. Accordingly, if Plaintiff disputes the wisdom of the NBA, her remedy lies with the U.S. Congress, not this Court. See Marquette, 439 U.S. at 318-319.

> B. The National Bank Act Applies to Assignees of a Debt Originated by a National Bank Regardless of Whether the National Bank Retains any Interest in the Debt

Plaintiff's assertion that courts have only applied the NBA to assignees where the national bank retains an interest in the debt, (DE 42 at p. 18), is demonstrably false. In fact, the holding in Munoz v. Pipestone Financial, LLC, 513 F. Supp. 2d 1076 (D. Minn. 2007), which Plaintiff fails to address, directly contradicts Plaintiff's erroneous characterization of the case law. In Munoz, the plaintiff, a Minnesota resident, entered a credit card agreement with a Delaware national bank where the applicable interest rate exceeded the rate allowed under Minnesota state law. When the plaintiff defaulted on his account, the national bank sold its *entire interest* in the account to a debt collection agency. Id. at 1078. Thereafter, defendant Pipestone purchased the account from the

6

initial assignee and retained defendant Messerli, a law-firm, to collect on the debt. Id. (citing Krispin v. May Dept. Stores, 218 F.3d 919 (8th Cir. 2000)). The Munoz court stated that although neither defendant was a national bank, "[c]ourts must look at 'the originating entity (the bank), and not the ongoing assignee … in determining whether the NBA applies." Munoz 513 F. Supp. 2d at 1079. Thus, the court found that the NBA controlled and that the defendants properly attempted to collect interest from the plaintiff at the rate specified in the cardmember agreement. Id.[1] See also Olvera v. Blitt & Gaines, P.C., 431 F.3d 285 (7th Cir. 2005) (assignee debt buyer permitted to collect same interest as original creditor under Illinois Interest Act). That Plaintiff utterly failed to address Munoz is telling.

But Plaintiff didn't just ignore entirely on-point authorities, she also disingenuously distinguished Defendants' other authorities to give the false impression that the NBA only applies to an assignee when the national bank maintains an interest in the debt. Indeed, in Hudson v. Ace Cash Express, Inc., 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. 2002), the court distinguished Krispin, 218 F.3d 919, on this point. Specifically the Hudson court noted that "***in contrast to the national bank in Krispin, which held no financial stake in the loans***, [the national bank in Hudson] retained a 5% stake in its loan." Id. at 14. (emphasis added). Thus, Plaintiff's argument that the holding in Krispin forecloses Defendants' position is entirely without merit. Indeed, in Krispin, as here, the bank retained no interest in the receivables they assigned to the store. Moreover, contrary to Plaintiff's misleading characterization of Hudson, the court did not find that the bank retaining a 5% participatory interest was a dispositive factor in determining whether the assignee was entitled to the protection of the NBA. Rather, the Court found that this was *further support* for its decision to grant a 12(b)(6) motion to dismiss. Hudson, 2002 U.S. Dist. LEXIS 11226 at 14.

---

[1] In Munoz, although the account had originated with a national bank, it had been sold twice and then re-assigned to a debt collection law firm. Thus, the Defendants here have a closer relationship to the national bank that originated the debt than the defendants in Munoz. Further, in Munoz, as in this case, the national bank was purchased and later merged into other banks after the plaintiff opened his account. Munoz, 513 F. Supp. 2d at 1078, n. 1.

7

Additionally, contrary to Plaintiff's argument, the facts herein closely parallel those in Krispin, 218 F.3d at 919. Here, as in Krispin, it is the bank, and not Defendants, that issues credit, processes and services customer accounts, and sets account terms including interest and late fees. Thus, the Defendants in this case play no role in issuing credit, processing or servicing accounts, or setting account terms. Rather, Defendants simply charge the agreed-upon interest rates that are disclosed in the cardholder agreement of an assigned account. Accordingly, here, as in Krispin, "for purposes of determining the legality of the [] fees charged to [Plaintiff's] credit account," the "real party in interest is the bank, not the [assignee]." Id. at 924.

Furthermore, there is nothing in the language of the NBA which contemplates excluding fully-assigned debts from its protection while allowing the NBA to control in instances of partially assigned debts. Indeed, if application of the NBA were contingent upon the degree to which the national bank retains an ongoing interest in the debt, it would engender precisely the type of confusion that Congress sought to avoid by establishing an exclusive federal remedy for debts originated by national banks. Further, it would create a system in which a purchaser of a defaulted account could easily "game" the system by having the assignor retain a negligible minority interest in the assigned debt. As such, the NBA's purpose of establishing a uniform system of banking rules is upheld by the Eighth Circuit's holding in Krispin, which found that "the non-usurious character of a note should not change when the note changes hands." Krispin, 218 F.3d at 19 (quoting, FDIC v. Lattimore Land Corp., 656 F.2d 139, 147-149 (5th Cir. 1981)).

Finally, the cases cited by Plaintiff in support of her contention that the NBA is inapplicable to assignees are entirely unavailing. In Ubaldi v. SLM Corp., 852 F. Supp. 2d 1190 (N.D. Ca. 2012), the plaintiff contended that her loan was "originated" by a national bank in name only and that her state-law claims should therefore survive a motion to dismiss. Id. at 1194-1195. Specifically, she contended that Sallie Mae, a non-national bank, was the "de facto lender" that

8

effectively "made" the loan because it owned the loan brand, underwrote the loan, funded and serviced the loan, directed its terms, bore the credit risk, and reaped most or all of the fees. Id. at 1200-1201. Here, by contrast, there is no contention that Defendants were a "de facto lender" and it is uncontested that Plaintiff's account was originated, serviced, and processed by a national bank until the account was closed and assigned to Defendants. Thus, the holding in Ubaldi has no bearing on the instant case.

In West Virginia v. Cashcall, 605 F. Supp. 2d 781, 788 (S.D. W. Va. 2009) the issue was whether the plaintiff's state-court claims were removable to federal court under the doctrine of complete pre-emption, which is very different from the substantive pre-emption defense.[2] Without addressing the substantive preemption issues presented here, the court found that the claims were not removable. Id. at 788. Moreover, in contrast to this case, Cashcall did not involve a legitimate assignment from a national bank. Rather, in Cashcall it was alleged that the defendant engaged in a "rent-a-bank" scheme designed to circumvent state usury laws when it was the "de facto lender." Id. at 783.

Similarly, in Brown v. Ace Case Express, Inc., 2001 U.S. Dist. LEXIS 25847 (D. Md. 2001), the question was one of removal and the issue was whether the claim fell within the "narrow range of cases where complete pre-emption grants [] federal jurisdiction." Id. at 5. Since the court did not address the substantive preemption issues here, Plaintiff's reliance on Brown is misplaced.

Finally, Citibank (South Dakota), N.A. v. Martin, dealt with summary judgment motions brought by the two plaintiffs, a credit card issuer and its assignee, on claims to *recover* an outstanding debt. Accordingly, the case's holding simply had no bearing on whether state-law

---

[2] See Whitman v. Raley's Inc., 886 F.2d 1177, 1181 (9th Cir. 1989) ("This jurisdictional issue of whether 'complete preemption' exists is very different from the substantive inquiry of whether a 'preemption defense' may be established."); Metropolitan Life Ins. Co. v. Taylor, 841 U.S. 58 (1987) ("The touchstone of the federal district court's removal jurisdiction is not the 'obviousness' of the pre-emption defense but the intent of Congress. Indeed, as we have noted, even an 'obvious' pre-emption defense does not, in most cases, create removal jurisdiction."); Ubaldi, 852 F. Supp. 2d at 1197.

usury claims brought *against* a national bank's assignee are pre-empted by the NBA.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court grant Defendants' motion for summary judgment, dismissing all claims against Defendants.

Dated: New York, New York
April 18, 2013

                                                Respectfully Submitted,

                    WILSON, ELSER, MOSKOWITZ, EDLEMAN & DICKER LLP

                    By:      /s/ Thomas A. Leghorn
                          Thomas A. Leghorn
                          150 E. 42nd Street
                          New York, NY 10017
                          (212) 490-3000 (phone)
                          (212) 490-3038 (facsimile)
                          thomas.leghorn@wilsonelser.com
                          *Attorney for Defendants*