UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SALIHA MADDEN, on behalf
of herself and all others
similarly situated,

        Plaintiff,

vs.

MIDLAND FUNDING, LLC
and MIDLAND CREDIT
MANAGEMENT, INC.

        Defendants.

INDEX: 11-CV-8149

HON. CATHY SEIBEL

---

### SURREPLY MEMORANDUM SUBMITTED IN FURTHER OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, PURSUANT TO THIS COURT'S ORDER DATED APRIL 26, 2013

---

May 14, 2013
New York, New York

Daniel A. Schlanger, Esq.
Elizabeth Shollenberger, Esq.
9 East 40th Street, Suite 1300
New York, New York 10016
Tel: (914) 946-1981, ext. 101
Fax: (914) 946-2930
daniel.schlanger@schlangerlegal.com
elizabeth.shollenberger@schlangerlegal.com

O. Randolph Bragg, Esq.
Horwitz, Horwitz and Associates
25 E. Washington, Suite 900
Chicago, Illinois 60602
Tel:: (312) 372-8822
Fax: (312) 372-1673
rand@horwitzlaw.com

*ATTORNEYS FOR PLAINTIFF*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1
ARGUMENT .................................................................................................................... 2
   I.    THERE IS NO ASSIGNMENT TO THE DEFENDANTS ................................ 2

   II.   THE ALLEGED INITIAL CONTRACT IS NOT LINKED TO MS. MADDEN AND LACKS CRUCIAL TERMS, E.G. THE INTEREST RATE ........................ 3

   III.  THE PURPORTED INITIAL AGREEMENT CANNOT BE UNILATERALLY AMENDED ........................................................................................................ 4

   IV.  THERE IS NO PROOF THAT MS. MADDEN ACCEPTED THE CHANGES EMBODIED IN THE PURPORTED AMENDED AGREEMENT .......................... 4

   V.   DELAWARE LAW DOES NOT APPLY AS A MATTER OF CONTRACT ........ 5

   VI.  ATTEMPTS TO CONTRACT AROUND NEW YORK'S CRIMINAL USURY LAW ARE INVALID AS A MATTER OF LAW .............................................................. 5

   VII. THE PELLICCIARO AFFIDAVIT IS FATALLY FLAWED AND SHOWS THAT SHE IS AN INADEQUATE CUSTODIAN OF THE RECORDS IN QUESTION ....... 6

   VIII. DEFENDANTS CANNOT RELY ON THE NBA TO AVOID NEW YORK'S USURY LAWS ............................................................................................................. 8

CONCLUSION ................................................................................................................ 10

Pursuant to the Court's Order dated 4/26/13 (ECF Doc. 55), Plaintiff respectfully submits this Surreply Memorandum in further opposition to Defendants' Motion for Summary Judgment.

## PRELIMINARY STATEMENT

In its moving papers, Defendants failed to produce any evidence of a contract between Plaintiff and the original creditor, Bank of America. Plaintiff's Opposition at 8-9. Nor did Defendants produce an assignment between the original creditor and Defendants. Id. at 9-11. Moreover, Defendants' custodian of records with regard to Plaintiff's interactions with the original creditor was an employee of the assignee, and his affidavit was grossly deficient. Id. at 4-8. As Plaintiff pointed out in opposition, these evidentiary failures were fatal, as Defendants' theory as to why it is entitled to charge 27% interest in violation of NY Penal Law § 190.40 (prohibiting criminal usury) is premised on its ability to prove its status as an assignee of a national bank entitled, pursuant to a contract, to charge this interest rate. E.g., id. at 2.

In a last gasp attempt to correct these flaws on reply, Defendants submit a new set of documents, not produced in discovery or with its moving papers, consisting of a purported original contract between the original creditor and Plaintiff, as well as an affidavit from an employee of FIA Bank. The submission is woefully inadequate: (1) The "original" contract is unsigned, undated and incomplete; (2) Defendants still fail to produce an assignment; and (3) the "new" affidavit remains insufficient to qualify these "proofs" as business records.

In sum, Defendants have failed entirely, even on reply, to meet their initial burden of establishing the absence of any genuine issue of material fact. Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). This would be so even were the Court not required to view the evidence and all factual interferences in the light most favorable to Plaintiff. Doro v. Sheet Metal Workers' Int'l Ass'n, 498 F.3d 152, 155 (2d Cir. 2007). As such, the burden never shifted to Plaintiff. Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006). In any event, Plaintiff's

1

rebuttal of the "evidence" submitted by Defendants is thorough and based on evidence in the record and, as such, is more than sufficient.

## ARGUMENT

### I. THERE IS NO ASSIGNMENT TO THE DEFENDANTS

Defendants submit no evidence of any assignment, only conclusory statements made by Misael Moreno [Moreno Aff. at ¶ 4(c)] and, now on Reply, by Debra Pellicciaro [Pelliccciaro Aff. at ¶ 4(d)]. Presumably, the Court is supposed to take their word that such an assignment exists, because neither of these custodians of records has produced it. Nor was the assignment produced in discovery. Schlanger Declaration dated 5/14/13 at ¶ 7, attached hereto.

In Henggeler v. Brumbaugh & Quandahl, P.C., 894 F. Supp. 2d 1180 (D. Neb. 2012), the Court rejected this Defendant's purported assignment, even though Midland had, in that instance, actually produced something beyond a mere assertion of a contract:

> Midland has not shown that it has a valid assignment of the purported debt, if valid, from Chase. The documentary evidence of the sale is incomplete. There is nothing that shows Henggeler's purported account was one of the Chase accounts sold to Midland. The "data file" referred to in the bill of sale was not provided to the court. Further, the sales agreement itself, though referenced in the bill of sale, was not attached and the one-page "closing statement" was extensively redacted. The affidavits on which Midland relies are not based on personal knowledge, contain hearsay and lack foundation.

Id. at 1187-88 (footnote omitted). See Opp. MOL at pp. 8-11 (collecting cases involving Midland's routine inability to prove up assignment of accounts).

Here, the assignment has not been provided at all. Without such an assignment, the Defendants' motion for summary judgment must fail. Indeed, where, as here, there is no documentary proof of an assignment, there can be no lawful collection of any debt. Matute v. Main St. Acquisition Corp., 2012 U.S. Dist. LEXIS 142589 (S.D. Fla. 2012).

## II. THE ALLEGED INITIAL CONTRACT IS NOT LINKED TO MS. MADDEN AND LACKS CRUCIAL TERMS, E.G. THE INTEREST RATE

The purported initial contract between Ms. Madden and Bank of America, submitted for the first time on Reply is unsigned, undated and incomplete. Nothing about the boilerplate contract offered up by Defendants [Pellicciaro Aff. at ¶ 6] ties Ms. Madden to the agreement.

Moreover, the document itself [Ex. B of the Pellicciaro Aff.] is only a part of the alleged agreement between the parties. The Document states in Sections 3.3, 3.4. 3.5, and 4.2 that there is an addendum called "Additional Disclosures" containing the heart of the agreement, *i.e.* the interest rate, the variable rate information, the minimum finance charge, and the amount of other fees and charges. These "Additional Disclosures"—clearly a key part of the alleged contract—have not been produced. Where essential terms of a purported contract are missing, there is no contract. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 78 (2d Cir. 1984).

Nor is there any admissible evidence regarding whether this document was sent to Ms. Madden other than her affidavit testimony that it was not. Rather, Ms. Pellicciaro, the purported custodian of books and records for FIA, states vaguely that "[w]hen Ms. Madden opened her account, she was provided with a copy of the applicable cardholder agreement" (Pellicciaro Aff.at ¶4). Critically, however, Ms. Pellicciaro fails to identify any document or record that is the basis for this bald assertion, much less attach same. She does not, for example, point to any notation in Ms. Madden's file indicating that an agreement was sent. Nor was any such document produced by Defendants in discovery. Schlanger Aff. at ¶ 7.

Ms. Madden, for her part, has submitted a Declaration swearing that she did not receive the purported initial contract. Declaration of Saliha Madden, dated 5/10/13, attached hereto, at ¶¶ 3,5. In short, there is – at a bare minimum – a genuine dispute as to whether the purported original contract produced by Defendants on reply was ever provided to Plaintiff.

### III. THE PURPORTED INITIAL AGREEMENT CANNOT BE UNILATERALLY AMENDED

Ms. Pellicciaro swears that "Ms. Madden's Cardholder agreement contains a provision stating that it may be unilaterally amended by Bank of America, N.A. upon notice thereof" [Pelliccciaro Aff. at ¶ 6]. *Not so.* Instead, the purported agreement actually states at ¶ 7.14 that "[i]f the amendment includes any change to the rate or rates of periodic interest that applies to your existing balances, we will obtain your consent before the New Term becomes effective."

### IV. THERE IS NO PROOF THAT MS. MADDEN ACCEPTED THE CHANGES EMBODIED IN THE PURPORTED AMENDED AGREEMENT

As stated above, pursuant to the terms of the contract which Defendants allege governed Ms. Madden's charge card [Document 53-2 at ¶ 7.14], FIA was required to obtain Ms. Madden's consent prior to changing the contract's term(s). Ms. Madden has sworn that she did not receive the alleged amendment and that she did not consent to the purported changes. Madden Decl. at ¶¶ 4, 5, and 7. Defendants have offered no proof of either the mailing or that Ms. Madden did, in any manner, accept the alleged changes FIA claims to have proposed.[1]

More generally, Defendants have never established what rates FIA was entitled to charge Ms. Madden, and certainly haven't established that it contracted with her to charge a rate of 27%. There is no interest rate set forth in the Agreement produced by Ms. Pelliccciaro [Document 53-2], which she alleges is the initial contract between Ms. Madden and Bank of America, N.A. Moreover, that alleged contract, on its face, states that it is governed by Arizona Law. Under Arizona Law, where no interest rate is specified, the interest rate is 10%, not the 27% sought by Defendants. A.R.S. § 44-1201.

---

[1] Moreover, Ms. Madden has submitted evidence that after the date of the alleged change in her account from Bank of America N.A. to FIA Card Services, N.A., she continued to receive correspondence from Bank of America, casting doubt on whether her account was actually transferred. Exhibits A, B, and D to Ms, Madden's Declaration dated May 10, 2013 all show that Ms. Madden was dealing not with FIA Card Services, N.A. but with Bank of America.

## V. DELAWARE LAW DOES NOT APPLY AS A MATTER OF CONTRACT

Defendants claim Delaware law applied to Ms. Madden's credit card as a contractual matter. Def. SJM MOL at p.5. As discussed above, however, the purported original contract that Defendants present on reply contains an *Arizona* choice of law provision. Also, as discussed above, there is no evidence that Ms. Madden ever consented to any amendment of the purported original contract, and she denies receipt of any 2006 amended agreement. Madden Decl. at ¶4.

## VI. ATTEMPTS TO CONTRACT AROUND NEW YORK'S CRIMINAL USURY LAW ARE INVALID AS A MATTER OF LAW

Even had Defendants provided evidence that Delaware law applied as a contractual matter, Defendants argument would fail. Courts have frequently held that New York's criminal usury laws express a fundamental public policy of the State and lenders cannot merely "contract around" the state's usury laws by means of a choice of law clause. North American Bank, Ltd. v. Schulman, 123 Misc.2d 516, 520 (Westchester County Ct. 1984) ("[T]he policy underlying our State's usury laws is in fact of a fundamental nature.")(citing Schneider v. Phelps, 41 N.Y. 2d 238, 243 (1976); In re McCorhill Pub., Inc., 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988)("New York has a strong public policy against interest rates which exceed 25%, which policy must be enforced. . . ."); Am. Ex. Travel Related Servs. Co., Inc. v Assih, 26 Misc.3d 1016, 1026 (N.Y. Civ. Ct. 2009).

Additionally, under its choice of law rules, New York uses the "center of gravity" test to determine the law governing a contract. This is true even when the parties' contract contains a choice of law provision. S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F. Supp. 1014, 1025 (S.D.N.Y. 1984)(citing Haag v. Barnes, 9 N.Y. 2d 554, 559-60 (1961))..

In the context of usury, both federal and state courts have used this approach. Am. Equities Group, Inc. v. Ahava Dairy Prods. Corp., 2004 U.S. Dist. LEXIS 6970 (S.D.N.Y. 2004)(rejecting the specification of New Jersey law in the parties' contract and applying New

5

York's usury law, choosing the law of the jurisdiction having the greatest interest in the litigation); Assih, 26 Misc. 3d at 1026 (rejecting Utah law specified in contract, finding "it is clear that New York has the most significant contacts to the parties and New York law will apply to the 'Agreement' in reference to whether or not the interest being charged is usurious")

In the instant case, the transaction's connection with New York are overwhelming, whereas its connection with Delaware is virtually non-existent. Delaware's only relationship to the contract is that FIA Card Services is incorporated there.[2] Under such circumstances, the application of Delaware law should be rejected. Culbert v. Rols Capital Co., 184 A.D.2d 612 ( 2d Dep't 1992)(rejecting choice of law clause specifying New Jersey usury laws where incorporation of creditor was the transaction's only connection to New Jersey).[3]

Finally, Defendant argues for the first time on Reply that Delaware law should govern based on the Supremacy Clause of the U.S. Constitution. Def. Reply MOL at 6. The Supremacy Clause, which allows Congress to pre-empt state regulation in some areas, would come into play here only if the Court were to find that (1) Defendants are legitimate assignees of a national bank (addressed above); (2) the contract between the bank and Plaintiff provided for Delaware law (addressed above); and (3) that the NBA applies to Defendants (addressed below).

VII. THE PELLICCIARO AFFIDAVIT IS FATALLY FLAWED AND SHOWS THAT SHE IS AN INADEQUATE CUSTODIAN OF THE RECORDS IN QUESTION

Ms. Pellicciaro, who purports to have "personal knowledge of the manner and method by which FIA Card Services, N.A. maintains its normal business records" [Pellicciaro Aff. at ¶ 1],

---

[2] Ms. Madden is a New York resident; she applied for credit with Bank of America, N.A. (an Arizona entity) in New York; the purchases made using her card were predominantly in New York with none made in Delaware; Ms. Madden received bills from Bank of America here in New York. Bank of America maintains hundreds of offices here in New York; Bank of America's headquarters is not located in Delaware, but rather in North Carolina, and Bank of America did not receive Plaintiff's payments in Delaware, but rather in New Jersey.

[3] Defendants' argument that Delaware law must apply because FIA made its credit approval decisions in Delaware and communicated its decisions regarding credit from Delaware. Def. MOL at p.5. These facts are irrelevant, because all parties acknowledge that FIA played no role whatsoever in the decision to extend credit to Ms. Madden or to communicate that decision to her. Even under the facts as alleged by the Defendants in their motion and reply, all those actions were taken by Bank of America, N.A. an Arizona corporation, not a Delaware corporation.

is offered up by Defendants as the person through whom their business records can be introduced. Def. Reply MOL at 2.

The principal precondition to admission of documents as business records pursuant to Fed. R. Evid. 803(6) is that the records have "sufficient indicia of trustworthiness to be considered reliable." Saks International, Inc. v. M/V "Export Champion" 817 F.2d 1011, 1013 (2d Cir. 1987). "The theory behind the exception to the hearsay rule for records made in the regular course of business is to permit the admission of business memoranda which impart a circumstantial guarantee of trustworthiness." United States v. Lavin, 480 F.2d 657, 662 (2d Cir. N.Y. 1973).

Ms. Pelliciaro's affidavit is a poster child for what is insufficient under this standard. To wit, Ms. Pellicciaro not only fails to discuss the document retention methods of her employer, but repeatedly offers documents that are, on their face grossly incomplete. For example, in submitting what she claimed was the initial agreement between Ms. Madden and Bank of America she offers only a partial cardholder agreement—one missing the "Additional Disclosures" containing the essential elements of the contract (e.g. the interest rates and other fees and charges to be charged). Not only does she fail to identify, much less explain, this deficiency but --to compound matters -- she then mis-describes the language of the purported agreement, which in fact specifically requires Ms. Madden's consent prior to any interest rate change.

Indeed, the affidavit is silent on all issues relevant to authentication: It contains no information regarding: the circumstances of the preservation of the record; the procedures under which the file is maintained; or procedures for assuring that the records in the files are not tampered with. Amer. Exp. Travel Related Servs. v. Vinhnee (In re Vinhnee), 336 B.R. 437, 444-445 (B.A.P. 9th Cir. 2005). Of course, if any of these documents are electronically stored

7

(and this seems likely, although Ms. Pelliciaro's affidavit is silent on the documents' format), the deficiencies are even more notable, as the affidavit is silent on "the particular computer equipment and programs used."; "policies and procedures for the use of the equipment, database, and programs"; "how access to the pertinent database is controlled", "how changes in the database are logged or recorded", and "audit procedures for assuring the continuing integrity". Id. at 445; Rambus, Inc. v. Infineon Techs. AG, 348 F. Supp. 2d 698, 703 (E.D. Va. 2004).

Her silence on these issues combined with the provision of documents that are, on their face, incomplete, leads inexorably to the conclusion that the documents provided lack "sufficient indicia of trustworthiness to be considered reliable" which the Second Circuit requires in the submission of business records.[4]

VIII. DEFENDANTS CANNOT RELY ON THE NBA TO AVOID NEW YORK'S USURY LAWS

Even assuming that Defendants had submitted a valid contract between Ms. Madden and Bank of America; and assuming that contract specified Delaware law; and assuming Defendants had submitted a scintilla of proof of the assignment of the account to the Defendants, Defendants motion for summary judgment would still fail as a matter of law.

In reply, Defendants' rely chiefly on Krispin v. May Dept. Store, 218 F.3d 919 (8th Cir.2000). In reality, Krispin supports Plaintiff's position. In Krispin, the Court acknowledged

---

[4] Defendants also attempt on Reply to resuscitate Mr. Moreno's initial affidavit by arguing that "because [he] is qualified to testify about MCM's business records, he is also qualified to testify about the incorporated FIA records". Reply at 1. In reality, the cases cited by Defendants, as well as the Second Circuit, hold that a custodian of records may qualify documents received from another company where (1) they have been integrated into the second entity's records; and (2) the documents "have been relied upon in [the second entity's] day to day operations". United States v. Jakobetz, 955 F.2d 786, 801 (2d Cir. 1992) (*emphasis added*); Air Land Forwarders, Inc. v. United States, 172 F.3d 1338, 1342 (Fed. Cir. 1999); U.S. v. Adefehiniti, 510 F. 3d 319, 325-6 (D.C. Cir. 2007). Mr. Moreno does not claim that Defendants relied in any way on the documents attached to his affidavit, or even that they were obtained prior to this litigation. Indeed, it appears they were not. Rather, opposing counsel indicated at the pre-motion conference held on December 17, 2012 that he did not file a motion to dismiss in this case because he did not have "the necessary documentation" in time to do so. 12/17/13 Hearing Transcript, attached as Exhibit E to Schlanger Decl., at p. 4, line 3-5. Indeed, Defendants did not make the supplemental document production containing the purported amended terms of Ms. Madden's contract with Bank of America ( attached to Mr. Moreno's affidavit) until 11/19/12, over five months after the initial production, and over a year after the action was filed. Schlanger Decl. at ¶¶ 11-13.

that as a general rule, the NBA applied only to national banks, but extended the NBA's application to a store where the store transferred the accounts to a wholly owned subsidiary national bank, but then purchased back the account receivables daily. Critically, the Court based its decision on the national bank's on-going, intense involvement with the accounts:

> [T]he store's purchase of the bank's receivables does not diminish the fact that it is now the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees. Thus, although we recognize that the NBA governs only national banks, cf., e.g., Green v. H&R Block, Inc., 981 F. Supp. 951, 955 (D. Md. 1997), in these circumstances we agree with the district court that it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies.

Id. at 924.

Krispin thus stands for the proposition that a non-bank entity may not rely on the NBA unless the national bank in question retains an interest or active involvement in the account.

In stark contrast, Defendants here allege that Midland Funding LLC "has obtained complete authority" over the account and "Fia Card Services, N.A., has no further interest in the account for any purpose" Pelliccciaro Aff. at ¶ 5. It is undisputed that FIA has no involvement of any kind in the account Midland seeks to collect upon. Put differently, the instant case lacks precisely those factors that Krispin found to justify extension of the NBA to a non-national bank. Under Krispin, where – as here – the NBA covered entity has no continuing interest or involvement in the debt, the NBA does not protect the non-bank assignee.

Contrary to Defendants' contentions on Reply, Plaintiff's understanding of Krispin was explicitly adopted in Hudson v. Ace Cash Express, 2002 U.S. Dist. LEXIS 11226 at *15 (S.D.Ind. 2002), which pointed to the degree of continuing national bank involvement and financial interest in the account in question as the determining factor *vis a vis* application of the National Bank Act usury exemption. ("The record shows that [national bank] Goleta actually made the loan *and retained an even greater financial interest in its loan to Hudson than the*

*national bank in Krispin, which the Eighth Circuit held sufficient to invoke the National Bank Act in that case.")(emphasis added).*

This Court has addressed the applicability of the NBA to assignees in <u>Vargas v. Choice Health Leasing</u>, 2010 U.S. Dist. LEXIS 88308, *15 (S.D.N.Y., 2010). There, the issue was the allegedly usurious fees charged by a dental equipment leasing company, Choice Health Leasing ("Choice"). When the original leasing agreements were made, Choice was a subsidiary of Citibank, N.A., a national bank. Thereafter, Citibank sold Choice. When the litigation arose, defendant Choice had no ongoing relationship with Citibank, other than as its former subsidiary, and the Court refused to apply the provisions of the National Banking Act, holding that "Sections 85 and 86 apply only to 'national banking associations' as that term is defined in 12 U.S.C. § 37." Id. at *15. Just as Choice is not a national bank, neither are the instant Defendants.

The *only* case which Defendants can realistically point to as supportive of their position is <u>Munoz v. Pipestone Financial, LLC</u>, 513 F. Supp. 2d 1076 (D. Minn. 2007). As pointed out in Plaintiff's Opposition (Opp. to SJM, at p. 22, n. 8), Munoz "offers no discussion or analysis" on this point and is in error.[5] The overwhelming weight of the law developed over numerous court cases is that the National Banking Act creates rules governing *national banks*, and only extends to an assignee where -- as is not the case here – the national bank retains an ongoing interest and/or involvement in the account. <u>Krispin</u> at 924; <u>Hudson</u> at *15; <u>Vargas</u> at *15-16.

## CONCLUSION

For all of the reasons stated above, in the attached Declarations and supporting Exhibits, and in Plaintiff's prior submissions in opposition, Defendants' motion for summary judgment should be denied in its entirety.

---

[5] The Defendants also cite <u>Olvera v. Blitt & Gains, P.C.</u>, 431 F.3d 285 (7th Cir. 2005), an analysis of Illinois law, not of the National Banking Act.

10

Dated: May 14, 2013

Respectfully Submitted,

*[signature]*

Daniel A. Schlanger, Esq.
Elizabeth Shollenberger, Esq.
Schlanger & Schlanger, LLP
9 East 40th Street, Ste. 1300
New York, NY 10016
Ph: 914-946-1981
Fax: 914-946-2930
daniel.schlanger@schlangerlegal.com
elizabeth.shollenberger@schlangerlegal.com

O. Randolph Bragg
*(Admitted pro hac vice)*
Horwitz, Horwitz and Associates, Ltd.
25 E. Washington, Suite 900
Chicago, Illinois 60602
Ph: 312-372-8822
Fax: 312-372-1673
rand@horwitzlaw.com

ATTORNEYS FOR PLAINTIFF