UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

SALIHA MADDEN, on behalf of herself and all others
similarly situated,

                             Plaintiffs,

                  -against-

MIDLAND FUNDING, LLC and MIDLAND CREDIT
MANAGEMENT, INC.,

                          Defendants.

-----------------------------------------------------------------------X

               11-CV-8149 (CS)

               **OPINION & ORDER**

Seibel, J.

      Before the Court are Defendants' Renewed Motion for Summary Judgment, (Doc. 112), and Plaintiff's Renewed Motion for Class Certification, (Doc. 99).  For the reasons stated below, Defendants' Motion is GRANTED in part and DENIED in part, and Plaintiff's Motion is GRANTED as modified below.

## I. **FACTUAL BACKGROUND**

      The following facts are set forth based on the parties' Local Civil Rule 56.1 statements and supporting materials, and are undisputed unless otherwise noted.  Plaintiff in this action, Saliha Madden, opened a credit card account with Bank of America on April 23, 2005.  (Doc. 117 ("P's Stmt. & Resp."), ¶ 10.)  Plaintiff received the Cardholder Agreement applicable to such accounts, and agreed to be bound by it.  (*Id.* ¶¶ 11, 12.)  The Cardholder Agreement provided that it was "governed by applicable Arizona and federal law."  (Doc. 113 ("Leghorn Decl.") Ex. 3-B ("Cardholder Agreement"), at 1.)

      Plaintiff's August 14, 2006 account statement was sent to her address in White Plains, New York, (Doc. 118 ("Schlanger Decl.") Ex. E, at 1), and disclosed a variable daily periodic

interest rate of 0.08833, which corresponds to an annual percentage rate of 32.24%, (P's Stmt. & Resp. ¶ 18).  It stated that payment was to be made online or sent to an address in Newark, New Jersey, and that billing disputes were to be sent to an address in Norfolk, Virginia.  (Schlanger Decl. Ex. E, at 2.)  The August 2006 account statement also contained an "Important Notice" alerting customers that Bank of America was "changing the terms of the Cardholder Agreement that governs [Plaintiff's] credit card Account."  (*Id.* at 1.)  Plaintiff received the Change in Terms attached to her August 14, 2006 account statement.  (P's Stmt. & Resp. ¶¶ 13, 14.)

The Change in Terms advised Plaintiff that, beginning on the effective date of October 19, 2006,[1] the Change in Terms would replace the Cardholder Agreement.  (Schlanger Decl. Ex. F ("Change in Terms"), at 1.)  It also stated that "beginning on October 19, 2006 . . . your Bank of America credit card account will be issued and administered by FIA Card Services, N.A." (*Id.*)  The Change in Terms provided that "The Agreement is made in Delaware and we extend credit to you from Delaware.  This Agreement is governed by the laws of the State of Delaware (without regard to its conflict of laws principles) and by any applicable federal laws."  (*Id.* ¶ 44.) FIA Card Services, N.A. ("FIA") was at all times relevant to this action an active national bank. (P's Stmt. & Resp. ¶ 16.)

On November 10, 2010, FIA sold, transferred, and set over unto Midland Funding, LLC ("Midland") Plaintiff's outstanding debt of $5,291.25, with full authority to perform all acts necessary for collection, settlement, adjustment, compromise, or satisfaction of the claim.  (*Id.* ¶ 20.)  This charge-off constituted an assignment of Plaintiff's debt from FIA to Midland.  (*Id.* ¶ 21.)  Midland is in the business of purchasing defaulted debts, (Doc. 16 ("Answer to AC"),

---

[1] Plaintiff states that "[t]he change in terms sent to her with her August 2006 account statement lists an 'Effective Date' of October 19, 2015."  (P's Stmt. & Resp. ¶ 15.)  This appears to be a typographical error, as I do not see any date other than October 19, 2006 in either the August 2006 account statement or the Change in Terms.

¶ 6), and Midland Credit Management, Inc. ("MCM") is in the business of collecting those debts, (*id.* ¶ 8).  Both are indirect wholly-owned subsidiaries of Encore Capital Group, Inc. and both have their principal places of business in San Diego, California.  (*Id.* ¶¶ 6-9.)

Midland sued Plaintiff in the City Court of the City of White Plains, Westchester County on May 2, 2011 to collect on her debt of $5,291.25.  (Schlanger Decl. Ex. A.)  In that complaint, Midland alleged that Plaintiff lived in White Plains, New York, and that its action to collect the debt arose out of transactions in Westchester County, New York.  (*Id.* at 2.)  That case has since been dismissed.  (Schlanger Decl. ¶ 3.)

## II.  <u>PROCEDURAL BACKGROUND</u>

Plaintiff filed the amended complaint on May 7, 2012, asserting violations of:  (1) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, based on Defendants' attempt to collect interest on her debt above the rate permitted by New York's usury laws; (2) New York General Business Law ("GBL") § 349, based on Defendants' representations that they were entitled to collect interest at a usurious rate; and (3) New York's civil and criminal usury laws, entitling Plaintiff to a declaration that her debts are void and to disgorgement.  (Doc. 13 ("AC"), ¶¶ 50-70.)

Plaintiff moved for class certification on January 18, 2013.  (Doc. 25.)  Defendants moved for summary judgment on January 25, 2013, (Doc. 30), arguing that Plaintiff's state-law claims were preempted by the National Bank Act ("NBA") and thus that Plaintiff's federal clam, which is predicated on the state law claims, also failed.  On September 30, 2013, I denied both motions, finding that although the NBA preempted state law usury claims against assignees of national banks, fact issues remained as to whether Plaintiff had agreed to the Cardholder Agreement and Change of Terms, and whether Plaintiff's debt had been validly assigned to

Defendants.  I also denied Plaintiff's motion for class certification because each individual's claims would turn on the factual issues I identified in Plaintiff's case.

The parties then entered into a Stipulation for Entry of Judgment dated May 30, 2014, agreeing that "FIA assigned Defendants Ms. Madden's account, and that Plaintiff received the Cardholder Agreement and Change in Terms."  (Doc. 84 Ex. 3 ("Stipulation"), ¶ 1.)  In light of the Stipulation, I entered judgment for Defendants on June 2, 2014.

The Second Circuit reversed and remanded, holding that the NBA did not preempt Madden's state law usury claims, but leaving it to me "to address in the first instance whether the Delaware choice-of-law clause precludes Madden's claims."  *Madden v. Midland Funding, LLC*, 786 F.3d 246, 247 (2d Cir. 2015).  The Second Circuit also vacated my denial of class certification as it was "entwined" with the preemption analysis, and remanded for me to consider the question again in light of its opinion.  *Id.* at 255.  Defendants' petition for writ of *certiorari* was denied on June 27, 2016.  (Doc. 126 Ex. 1.)

Defendants now move for summary judgment again, (Doc. 112), arguing that Delaware law applies to Plaintiff's claims, and so Plaintiff's claims under New York law fail, (Doc. 114 ("Ds' Mem."), at 1).  Defendants further argue that because governing Delaware law imposes no usury cap and Plaintiff's FDCPA claims are predicated on a violation of New York's usury laws, Plaintiff's FDCPA claims must also fail.  (*Id.*)

Plaintiff moves again for class certification.  (Doc. 99.)

## III.  SUMMARY JUDGMENT

### A.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

4

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R.

Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d

Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of

fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed

for purposes of the motion" or "grant summary judgment if the motion and supporting materials

– including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ.

P. 56(e)(2)-(3).

**B.  Delaware & New York Usury Law**

At the outset, Defendants argue that even if the Court were to apply New York law,

Plaintiff's claims would fail because New York's usury laws, on which Plaintiff's claims are

predicated, do not apply to defaulted obligations like Plaintiff's.

Delaware usury law provides no cap on interest rates, but instead allows interest to be

charged in an amount pursuant to the agreement governing the debt.  *See* Del. Code Ann. tit. 5

§ 943; *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 622 (3d Cir. 2009) ("Delaware has no

usury law.").  Defendants argue, and Plaintiff does not dispute, that were Delaware law to apply,

it would not prohibit Defendants from charging the interest rate in question.  (Ds' Mem. 13; *see*

Doc. 98 ("P's Class Cert. Mem."), at 11 (Utah law "like Delaware, provided for no usury cap").)

New York's "civil usury cap" forbids charging interest on a "loan or forbearance" at a

rate above 16% annually.  *See* N.Y. Gen. Oblig. Law § 5-501(1)-(2); N.Y. Banking Law § 14-

a(1).  Generally, corporations may not assert a civil usury defense.  N.Y. Gen. Oblig. Law § 5-

521(1).  The civil usury cap does not apply to defaulted obligations.  *See Manfra, Tordella &*

*Brookes, Inc. v. Bunge*, 794 F.2d 61, 63 n.2 (2d Cir. 1986) ("[T]he usury laws do not apply to

defaulted obligations."); *Bruce v. Martin*, 845 F. Supp. 146, 150 (S.D.N.Y. 1994) ("Under

*Manfra*, Section 5-501 is inapplicable to the defaulted obligations under the Notes.").  The

parties agree the Plaintiff's debt is in default, so the civil usury cap is inapplicable here.  (*See* Doc. 129 ("P's Supp. Mem."), at 1; Doc. 128 ("Ds' Supp. Mem."), at 1-2.)

New York's "criminal usury cap" makes it a felony to knowingly charge or collect interest on a "loan or forbearance" at a rate above 25% annually.  *See* N.Y. Penal Law § 190.40. Nothing prevents a corporation from asserting a criminal usury defense.  N.Y. Gen. Oblig. Law § 5-521(3).  Defendants contend that the criminal usury cap does not apply to defaulted obligations, (Ds' Supp. Mem. 1-5), while Plaintiff contends that it does, (P's Supp. Mem. 1-5).

Defendants argue that the Second Circuit's decision in *Manfra* controls and that it "clearly recognized that usury has no application with regard to defaulted obligations."  (Ds' Supp. Mem. 2.)  In *Manfra*, the plaintiff extended credit to the defendant for the purchase and sale of gold, the agreement for which required the defendant to pay immediately upon confirmation of purchases.  794 F.2d at 62.  The defendant failed to make certain payments, and accumulated indebtedness to the plaintiff with interest charged at rates between 22% and 27%. The plaintiff agreed to consolidate the defendant's debt into one promissory note with an interest rate of 18%, on which the defendant also failed to make payments.  The plaintiff sued on the note, and the court held that the defense of usury was unavailable to the defendant because the debt was not a "loan or forbearance" under New York law.  *Id.* at 62-63.  In a footnote, the court added that "the usury laws do not apply to defaulted obligations.  Because interest was charged only on [the defendant's] past due debts, the usury laws do not apply."  *Id.* at 63 n.3 (citing *Am. Express Co. v. Brown*, 392 F. Supp. 235, 238 (S.D.N.Y. 1975) and *Bloom v. Trepmal Constr. Corp.*, 289 N.Y.S.2d 447 (2d Dep't), *aff'd*, 244 N.E.2d 62 (N.Y. 1968)).  Because the interest rate on the note was above the civil usury cap but below the criminal usury cap, the *Manfra* footnote – which is *dictum* in any event – cannot definitively be said to have ruled out

application of the criminal usury cap to defaulted obligations.  But its language does not distinguish between the two caps, lending some support to Defendants' position.

Plaintiff argues, however, that "New York's Courts have repeatedly and explicitly held that New York's criminal usury cap applies even where an obligation is exempt from New York's civil usury laws."  (P's Supp. Mem. 1.)

"As a federal court applying state law, [I am] generally obliged to follow the state law decisions of state intermediate appellate courts."  *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199-200 (2d Cir. 2005) (internal quotation marks omitted).  I will thus look first to decisions of New York state courts (to only one of which Defendants cites, in their Reply brief).

1.  Underline State Court Decisions

In *Bloom*, a 1968 state court decision cited by *Manfra*, the Second Department held (without discussion) that a provision in a note fixing interest at a rate above 25% annually upon default or maturity was valid and enforceable.  *See* 289 N.Y.S.2d at 448.  The Second Department cited two New York Court of Appeals cases in support of this holding – *Union Estates Co. v. Adlon Construction Co.*, 116 N.E. 984 (N.Y. 1917), and *Salvin v. Myles Realty Co.*, 124 N.E. 94 (N.Y. 1919) – but they do not support the proposition for which *Manfra* cited *Bloom* or for which Defendants cite *Manfra*.  Both of those decisions held that the usury statute in effect at the time expressly prohibited corporations from raising a usury defense, but did not address the application of the usury laws to defaulted obligations.  *See Salvin*, 124 N.E. at 96; *Union Estates Co.*, 116 N.E. at 985.  The cases also held that parties were free to agree to an increased interest rate upon default or maturity of an obligation, and that the fact of such an increase would not be considered an impermissible penalty.  *Union Estates Co.* explained that such an increased rate would still be subject to an unconscionability analysis, suggesting that the

8

rate charged upon default was not without bounds.  116 N.E. at 985-86 ("It may be that a stipulated rate may be so excessive that the contract will . . . be adjudged unconscionable and invalid . . . .").

In any event, several more recent New York cases have held that, where a contract provision allows collection of interest at "the highest interest permitted under the law," New York's criminal usury cap applies to prevent a creditor from collecting interest above 25% even in default.  *See 815 Park Ave. Owners Corp. v. Lapidus*, 643 N.Y.S.2d 89, 90 (1st Dep't 1996); *Stein v. Am. Mortg. Banking, Ltd.*, 628 N.Y.S.2d 162, 164 (2d Dep't 1995); *Emery v. Fishmarket Inn of Granite Springs*, 570 N.Y.S.2d 821, 824 (2d Dep't 1991); *Nextbridge Arc Fund, LLC v. Vadodra Prop., LLC*, 929 N.Y.S.2d 201, 2011 WL 1124347, at *3 (Sup. Ct. Queens Cty. Mar. 11, 2011) (citing *Emery*, 570 N.Y.S.2d 821).  One decision held outright that the interest on a defaulted mortgage above 25% was "a criminally usurious rate."  *See Emigrant Funding Corp. v. 7021 LLC*, 901 N.Y.S.2d 906, 2009 WL 3530022, at *4 (Sup. Ct. Queens Cty. Oct. 26, 2009).  These cases are strong indicators that New York's criminal usury cap applies even to defaulted obligations.

In *Emery*, a mortgagee sought to collect interest on a defaulted purchase money mortgage.  In the event of default, the mortgage allowed the mortgagee to collect "the highest interest permitted under law."  *Emery*, 570 N.Y.S.2d at 823.  The court recognized that § 5-501 does not apply to purchase money mortgages, *id.* at 824 (citing, among other things, *Barone v. Frie*, 472 N.Y.S.2d 119 (2d Dep't 1984) (purchase money mortgage not a "loan or forbearance")), but found that the parties nevertheless intended the interest charged on default to be capped by New York's usury laws, including §§ 190.40, 190.42, under which the "highest interest permitted by law" was 25%.  *Id.*  Defendants contended at oral argument that *Emery*

9

merely decided what the parties had in mind, not what the law permits, but they overlook *Emery*'s acknowledgement that interest rates on defaulted debts are subject to usury limits.  *See id.* at 823 ("[S]o long as an interest rate is not usurious or does not constitute a penalty, the parties are . . . free to agree that the contract rate of interest shall increase upon default.").

In *815 Park Ave*, a residential lease contained a provision stating that in the event of a default in the payment of rent, the lessee would pay interest at the "maximum legal rate."  643 N.Y.S.2d at 90.  Because the lessee was eventually charged 1.5% per month (or 19.56% annually when compounded) – a rate above the civil usury cap but below the criminal cap – the court relied on *Emery* in holding that rate permissible.  *See id.*

In *Stein*, a mortgage provided that the interest rate on any unpaid balance after the maturity date would be 2% monthly, or if that was above the maximum rate permissible by law, then the maximum rate permissible by law.  628 N.Y.S.2d at 162.  Citing § 5-521 and § 190.40 – citations that would have been unnecessary had the criminal usury cap been inapplicable to defaulted obligations – the court held that 2% monthly was not above the maximum rate and therefore permissible.[2]  *Id.*

In *Nextbridge Arc Fund*, a mortgage note provided that the annual interest rate in the event of a default would increase to the lower of either 18% above the current rate or "the highest rate allowed by law."  2011 WL 1124347, at *3.  The court, citing § 190.40 and *Emery*, noted that "[t]he highest interest rate allowed by law is 25% per annum."  *Id.*

While several post-*Emery* decisions can be read to suggest that the criminal usury cap does not apply to defaulted obligations, *see Hicki v. Choice Capital Corp.*, 694 N.Y.S.2d 750,

---

[2] A monthly interest rate of 2% is equivalent to an annual rate of 24% when compounded annually, and an annual rate of 26.82% when compounded monthly.  Because the *Stein* court cited § 190.40 and did not mention any rule allowing creditors to charge rates in excess of the criminal usury cap, it appears that the court treated the 2 percent monthly rate as compounding annually, and thus equivalent to an annual rate of 24%.

751 (2d Dep't 1999); *Miller Planning Corp. v. Wells*, 678 N.Y.S.2d 340, 340-41 (2d Dep't 1998); *Shorehaven Assocs., Inc. v. King*, 587 N.Y.S.2d 190 (2d Dep't 1992), a careful reading of this line of cases shows that they are distinguishable. *Hicki* stands for the uncontroversial proposition that the civil usury cap does not apply to defaulted obligations. 694 N.Y.S.2d at 751 ("The Supreme Court incorrectly determined that the subject loan was usurious because the plaintiff was required to pay interest at a rate greater than 16% per year after the original maturity date of the loan."). In *Shorehaven Associates*, the court held that a "defense of usury based upon a provision in the mortgage increasing the interest to a higher rate upon a default in payment is meritless." 587 N.Y.S.2d at 191. This case does not support the proposition that the criminal usury cap does not apply to defaulted debts, because one cannot tell from the one-paragraph decision what interest rate was charged, whether the defense was based on the mere fact of an increase (which indeed would have been meritless, *see Emery*, 570 N.Y.S.2d at 823), or even if the court purported to address the applicability of the criminal usury cap. In *Miller Planning Corp.*, the court held that "for the purpose of determining usury, the effective annual interest rate . . . did not exceed the legal maximum." 678 N.Y.S.2d at 340. The court then went on to note that "[f]urthermore, the defense of usury does not apply where, as here, the terms of the mortgage and note impose a rate of interest in excess of the statutory maximum only after default or maturity." *Id.*; *see also Kraus v. Mendelsohn*, 948 N.Y.S.2d 119, 120 (2d Dep't 2012) (same, quoting *Miller Planning Corp.*). To support this holding, the *Miller Planning Corp.* court cited *Bloom* (the shaky foundation of which I addressed above), *Shorehaven Associates*, and *Klapper v. Integrated Agricultural Mgmt. Co.*, 539 N.Y.S.2d 812 (3d Dep't 1989). In *Klapper*, the court held that a rate of 18% charged upon default was not usurious. 539 N.Y.S.2d at 814 ("The defense of usury does not apply where the terms of a promissory note impose a rate of

interest in excess of the statutory maximum only after maturity of the note.").[3]  Because 18% is not above the criminal usury cap of 25%, it is clear that the *Klapper* court was addressing only the *civil* usury cap's inapplicability to defaulted obligations.  *Miller Planning Corp.* did not state the rate charged and so it cannot be presumed it was exempting defaulted debt from the civil *and* criminal usury caps.

Based on this survey of New York state cases, I believe that the New York Court of Appeals, were it to face this situation, would hold that the criminal usury cap limits interest charged on debts to 25% annually, even for defaulted debts.  I will next address federal court decisions addressing this question, bearing in mind my obligation to follow New York law as described by New York State's courts.

### 2.  Federal Court Decisions

In *Brown*, 392 F. Supp. 235, the federal case relied on in *Manfra*'s footnote, a credit card company had executed a promissory note in satisfaction of the defendant's unpaid credit card debt.  After the defendant failed to make payment on the note, the credit card company sued to collect on the note plus interest.  The court dismissed as frivolous the defendant's criminal usury defense, stating that "enforcement of New York state's criminal usury law is beyond my jurisdiction and . . . the defendant lacks the power to enforce the criminal usury law of the state."

---

[3] Several decisions have repeated *Klapper*'s statement in holding that a rate below 25% was not usurious because, *besides being below the criminal usury cap*, the usury defense does not apply to defaulted obligations.  *See Kirzner v. Plasticware, LLC*, 16 N.Y.S.3d 792, 2015 WL 1723411, at *7-8 (Sup. Ct. Kings Cty. Apr. 15, 2015) (24% default rate not usurious); *Zara Realty Holding Corp. v. E&J Deli & Grocery, Inc.*, 950 N.Y.S.2d 611, 2012 WL 687904, at *5 (Sup. Ct. Queens Cty. Feb. 29, 2012) (same); *Ron King Corp. v. R&R Mohring Enters., Inc.*, No. 6366/11, 2011 N.Y. Misc. LEXIS 4642, at *7-8 (Sup. Ct. Nassau Cty. 2011) (20% default rate not usurious).  Other decisions have repeated this statement in simply holding that a rate below 25% is not usurious.  *See The Wheatley Harbor, LLC v. Horseblock Equities, Inc.*, No. 22903/12, 2013 N.Y. Misc. LEXIS 5592, at *4, 10-11 (Sup. Ct. Suffolk Cty. Oct. 22, 2013) (24% default rate not usurious); *Horizons Invs. Corp. v. Brecevich*, No. 114600/09, 2011 N.Y. Misc. LEXIS 3939, at *4-5 (Sup. Ct. N.Y. Cty. July 13,, 2011) (same).  Because these decisions did not address the current situation, where the default rate was higher than the criminal usury cap, I find them unpersuasive.

392 F. Supp. at 237-38.  The court did not otherwise address the applicability of the criminal usury cap to defaulted obligations, and so does not appear to support the *Manfra* footnote.[4]

Since *Manfra*, there has been some confusion in the federal courts as to whether the criminal usury cap applies to defaulted obligations.  On the one hand, some courts have held that the footnote in *Manfra* referred only to the civil usury cap.  *See T&S Chinatown Trading v. Lin China Buffet*, No. 95-CV-9090, 1996 U.S. Dist. LEXIS 11867, at *5-6 (S.D.N.Y. Aug. 15, 1996) ("Under New York law, the interest recoverable in the event of a default is capped by New York criminal usury law."); *Bruce*, 845 F. Supp. at 150 ("Under *Manfra*, Section 5-501 is inapplicable to the defaulted obligations under the Notes.  As in *Emery*, this does not leave the interest rate without a discernable cap.  Rather, the interest rate is 'capped' by Section 190 at 25% per annum.").

On the other hand, many federal courts have applied *Manfra* to bar a claim or defense for usury.  *See, e.g.*, *Bristol Inv. Fund*, 310 F. Supp. 2d at 562 ("[I]t is well established that the usury statutes do not apply to defaulted obligations."); *In re Integrated Res., Inc. Real Estate Ltd. P'ship Sec. Litig.*, 851 F. Supp. 556, 565 (S.D.N.Y. 1994) ("Any penalty interest rates or late fees assessed against the Plaintiffs do not constitute usury, since New York's usury statutes do not apply to defaulted obligations.").

Many of the cases that seem to suggest that the criminal usury cap does not apply to defaulted obligations in fact addressed default rates that were below 25%, and so would not have violated the criminal usury cap even if it applied.  *See, e.g.*, *Llewellyn v. Asset Acceptance*, No. 14-CV-411, 2015 WL 6503893, at *8-9 (S.D.N.Y. Oct. 26, 2015) (9% interest rate collected after default not usurious), *aff'd*, __ F. App'x __, No. 15-3681-cv, 2016 WL 5944723 (2d Cir.

---

[4] Further, as discussed at page 16 below, *Brown* was incorrectly decided.

Oct. 13, 2016); *Prowley v. Hemar Ins. Corp. of Am.*, No. 05-CV-981, 2010 WL 1848222, at *4 (S.D.N.Y. May 7, 2010) (8.75% interest rate on defaulted obligation does not give rise to claim for "civil usury"); *In re Vargas Realty Enters., Inc.*, 440 B.R. 224, 233-34 (S.D.N.Y. 2010) (plaintiff's criminal usury claim failed because, among other reasons, the default rate was only 24%); *Schwartzbaum v. Emigrant Mortg. Co.*, No. 09-CV-3848, 2010 WL 2484116, at *6 (S.D.N.Y. Apr. 22, 2010) (claim for usury failed based on 18% default rate), *report and recommendation adopted in part and rejected in part*, 2010 WL 2484116 (S.D.N.Y. June 16, 2010); *Roswell Capital Partners LLC v. Alt. Constr. Techs.*, No. 08-CV-10647, 2009 WL 222348, at * (S.D.N.Y. Jan. 30, 2009) (default rate of 18% not usurious); *see also Avila v. Riexinger & Assocs, LLC*, Nos. 13-CV-4349, 14-CV-2740, 2015 WL 1731542, at *11 (S.D.N.Y. Apr. 14, 2015) (§ 5-501 claim for civil usury failed because debt was in default), *aff'd in part*, 817 F.3d 72 (2d Cir. 2016), *vacated in part on other grounds*, 644 F. App'x 19 (2d Cir. 2016). These cases did not address a default rate in excess of the criminal usury cap.  Thus, even where they purport to hold that defaulted obligations are immune from all usury protection, they should be understood only as supporting the unremarkable proposition that – as in *Manfra – the civil usury cap* does not apply to defaulted obligations.  *See Schaefer v. State Ins. Fund*, 207 F.3d 139, 143 (2d Cir. 2000) (disregarding part of district court's opinion as dictum that "was unnecessary to its holding").

Defendants cite several additional federal court decisions that they argue show that the criminal usury cap does not limit interest rates charged on defaulted obligations.  *See Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 340 (S.D.N.Y. 2013) (citing *Manfra*, 794 F.2d at 63 n.3) (without noting what interest rate was, holding increase in interest rate upon default irrelevant to usury analysis because "default payments are separate and distinct

from the actual interest rate and therefore are not relevant in determining if the rate is usurious");
*Sabella v. Scantek Med., Inc.*, No. 08-CV-453, 2009 WL 3233703, at \*17 (S.D.N.Y. Sept. 25,
2009) (criminal usury defense not available for loans over $2.5 million or "where the loan
imposes an interest rate greater than the statutory maximum only after a default") (quoting
*Roswell Capital*, 2009 WL 222348, at \*15); *Urban Communicators PCS Ltd. P'ship v. Gabriel
Capital, L.P.*, 394 B.R. 325, 341-42 (S.D.N.Y. 2008) (New York usury laws do not apply to
defaulted obligations).[5]  To the extent these decisions contain statements about New York law
that are at odds with New York state court decisions like *Emery*, the state court decisions control.
*See Broder*, 418 F.3d at 200-01.[6]

   In sum, although the issue may ultimately have to be settled by the New York Court of
Appeals, I conclude, based on *Emery* and its progeny, that New York's criminal usury cap
applies to prevent a creditor from collecting interest above 25% on a defaulted debt.

### 3.  "Enforcement" of New York's Criminal Usury Cap

   Defendants argue that even if New York's criminal usury cap applied to Plaintiff's debt,
private actors (and federal courts) are not allowed to enforce the criminal usury law.  (Ds' Supp.
Mem. 5.)   Plaintiff responds, however, that hers is not a suit to enforce the criminal usury cap:

---

[5] It is worth noting that in *Urban Communicators*, the court explained that the loan had an interest rate of 15%,
which rose to 19% in default.  394 B.R. at 342.  The court then made clear that "[a]s a matter of mathematics, the
effect of compounding quarterly did not cause the simple interest equivalent to reach twenty-five percent until more
than three years after the default."  *Id.*  That is not the case here, where Plaintiff's account statement disclosed an
interest rate equivalent to an annual rate of 32.24%.  (P's Stmt. & Resp. ¶ 18.)

[6] A recent Second Circuit summary order might also suggest that *Manfra*'s footnote should be understood to address
only the civil usury cap.  In *Llewellyn*, the Second Circuit held that the district court correctly determined that a debt
collecting entity, which was not a national bank and thus was subject to New York's usury laws, did not charge the
plaintiff "usurious interest on her post-default debt," __ F. App'x __, 2016 WL 5944723, at \*2, when it charged an
interest rate of 9%, *see* 2015 WL 6503893, at \*9 (S.D.N.Y. Oct. 26, 2015).  Because it is settled that the civil usury
cap does not apply to post-default debts, *see Bruce*, 845 F. Supp. at 150; *see also Emigrant Funding Corp.*, 2009
WL 3530022, at \*4 (permissible to charge 24 percent on defaulted debt), this comment would be unnecessary unless
post-default debts remain subject to the criminal usury cap, although it was not violated there.  *See Llewellyn*, __ F.
App'x __, 2016 WL 5944723, at \*2.

"The question for FDCPA purposes is not whether the criminal usury statute provides a private right of action or affirmative defense, but whether Defendants were legally entitled to the amounts they sought to collect."  (P's Supp. Mem. 7.)  While Defendants' entitlement to the amount and interest rate they sought to collect is set by New York's criminal usury cap, *see Johnson v. Riddle*, 305 F.3d 1107, 1117-18 (10th Cir. 2002) (whether collection is "permitted by law" is determined by Utah state law), Plaintiff's federal cause of action here arises under the FDCPA, which Congress intended to be enforced through private lawsuits, *see Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich L.P.A.*, 559 U.S. 573, 577 (2010).

Defendants' citation to *Bruce*, 845 F. Supp. at 149-50, and *Brown*, 392 F. Supp. 235 – to the effect that private parties and courts cannot enforce the criminal usury laws – misunderstands those decisions.  (Ds' Supp. Mem. 5.)  *Bruce* held that the criminal usury law set the maximum interest rate "permitted by law," even as to defaulted obligations, 845 F. Supp. at 150, and therefore assists Plaintiff.  *Brown* rejected a criminal usury defense, holding that federal courts do not have jurisdiction – and private parties do not have the power – to enforce state criminal law.  392 F. Supp. at 237-38.  This holding, however, mixes apples and oranges:  while private parties cannot initiate, and federal courts cannot entertain, prosecutions for violation of state criminal laws, defendants (including corporate defendants) may assert a defense of criminal usury.  *See* N.Y. Gen. Obl. Law § 5-521(3); *Hammelburger v. Foursome Inn Corp.*, 431 N.E.2d 278, 284 (N.Y. 1981) ("Noteworthy is the fact that . . . the Legislature authorized the pleading of criminal usury as a defense by a corporation . . . .").

In any event, Plaintiff is not seeking to base a defense to liability on the criminal usury cap, nor is she attempting to subject Defendants to the punishment set forth in § 190.40 and thereby enforce the criminal law.  Rather, Plaintiff claims that because Defendants sought to

collect interest at a usurious rate, their collection letters overstated the amount of interest they were entitled to collect in violation of various provisions of the FDCPA:  § 1692e(2)(A) (false representation of the "character, amount, or legal status of any debt"); § 1692e(5) ("[t]he threat to take any action that cannot legally be taken"); § 1692e(10) (the "use of any false representation or deceptive means to collect or attempt to collect any debt"); and § 1692f(1) (attempting to collect "unless such amount is expressly authorized by the agreement creating the debt or permitted by law").  (*See* P's Class Cert. Mem. 5-6; AC ¶ 55(a)-(d).)

Plaintiff is correct that predicating FDCPA claims on violations of state usury laws "is a well-established theory of FDCPA liability."  (P's Supp. Mem. 7.)  *See Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 450-51 (6th Cir. 2014) (attempting to collect interest without right to do so could be violation of §§ 1692e(2), (5) and § 1692f(1)); *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 406-08 (3d Cir. 2000) (collecting interest at usurious rate, *i.e.*, rate prohibited by state law, constitutes violation of § 1692f(1)); *Gerstle v. Nat'l Credit Adjusters, LLC*, 76 F. Supp. 3d 503, 512 (S.D.N.Y. 2015) (attempting to collect usurious debt "constitutes an unlawful threat under the FDCPA"); *see also Tuttle v. Equifax Check Servs.*, 190 F.3d 9, 13 (2d Cir. 1999) (under § 1692f(1), "[i]f state law expressly prohibits service charges, a service charge cannot be imposed even if the contract allows it").

In sum, I find that if New York law applies to this case, the criminal usury cap applies to Plaintiff's debt, and is available as a predicate for Plaintiff's FDCPA claims.  Given, however, that both parties agree that the civil usury cap does not apply to Plaintiff's defaulted obligation, *see Bruce*, 845 F. Supp. at 150; *Emigrant Funding Corp*, 2009 WL 3530022, at *4, and that it appears clear from the case law and the statute itself that the criminal usury law does not provide a private right of action, *see* N.Y. Penal Law § 190.40; *see, e.g.*, *Llewellyn*, 2015 WL 6503893,

17

at *9 n.4 (S.D.N.Y. Oct. 26, 2015); *cf. Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F.

Supp. 2d 126, 139-40 (S.D.N.Y. 1999) (no private right of action for violation of commercial

bribery statute, N.Y. Penal Law § 180.03), I grant summary judgment in Defendants' favor on

Plaintiff's usury claims under § 5-501 and § 190.40.

## C.  Choice of Law

I next turn to whether New York law governs Plaintiff's FDCPA and GBL claims.

"Where, as here, the parties have agreed on the law that will govern their contract, it is the policy

of the courts of this State to enforce that choice of law provided that (a) the law of the State

selected has a 'reasonable relation[ship]' to the agreement and (b) the law chosen does not

violate a fundamental public policy of New York."  *Finucane v. Interior Constr. Corp*, 695

N.Y.S.2d 322, 324-25 (1st Dep't 1999) (citations omitted) (quoting *A.S. Rampell, Inc. v. Hyster

Co.*, 144 N.E.2d 371, 379 (N.Y. 1957)) (alteration in original).  To avoid enforcement of the

parties' choice of Delaware law, Plaintiff must either show that the Delaware forum bears no

reasonable relationship to the parties or the transaction, or that applying Delaware law would

violate a fundamental public policy of the state of New York.  *See Welsbach Elec. Corp. v.

MasTec N. Am., Inc.*, 859 N.E.2d 498, 500-01 (N.Y. 2006) (public policy exception limits

freedom to contract even where reasonable relationship exists); *Finucane*, 695 N.Y.S.2d at 324-

25 (courts enforce choice of law provisions if reasonable relationship exists *and* foreign law

would not offend fundamental public policy).

### 1.  Reasonable Relationship

"Generally, courts will enforce a choice-of-law clause so long as the chosen law bears a

reasonable relationship to the parties or the transaction."  *Welsbach Elec. Corp.*, 859 N.E.2d at

500.[7]  In addressing that issue, courts have looked to the location of the following factors:  the

parties' negotiation of the agreement; performance under the agreement, including where loan

payments were received; the parties' places of incorporation; the parties' principal places of

business; and the property that is the subject of the transaction.  *See Am. Equities Grp., Inc. v.*

*Ahava Dairy Prods. Corp.*, No. 01-CV-5207, 2004 WL 870260, at *8 (S.D.N.Y. Apr. 23, 2004);

*Astoria Fed. Mortg. Corp. v. Pellicane*, 913 N.Y.S.2d 228, 230 (2d Dep't 2010); *Gambar Enters.*

*v. Kelly Servs., Inc.*, 418 N.Y.S.2d 818, 822 (4th Dep't 1979); *Klein v. On Deck Capital*, 17

N.Y.S.3d 383, 2015 WL 3936167, at *3 (Sup. Ct. Westchester Cty. June 24, 2015); *Am. Express*

*Bank, FSB v. Dalbis*, No. 300082/10, 2011 WL 873512, at *9-12 (Civ. Ct. Richmond Cty. Mar.

14, 2011); *Am. Express Travel Related Servs. Co. v. Assih*, 893 N.Y.S.2d 438, 445-46 (Civ. Ct.

Richmond Cty. 2009).  The fact that one of the parties' principal place of business is in the

selected forum is enough to satisfy the reasonable relationship test.  *See Finucane*, 695 N.Y.S.2d

at 325.  A party may not evade New York's usury laws, however, by merely "nominally

operating" in another jurisdiction.  *Culbert v. Rols Capital Co.*, 585 N.Y.S.2d 67, 67 (2d Dep't

1992).

Most of these factors do not appear to support a finding that a reasonable relationship

exists between the parties, the transaction, and the Delaware forum.  In 2005, Plaintiff opened

her credit card with Bank of America, (P's Stmt. & Resp. ¶ 10), which is headquartered in

---

[7] Several federal court decisions appear to rely on an outdated standard allowing courts to avoid parties' choice of
law when the "most significant contacts" occur in another forum.  *See Agric. Ins. Co. v. Ace Hardware Corp.*, No.
98 Civ. 8708, 2003 WL 164272, at *5 (S.D.N.Y. Jan. 17, 2003) ("'The New York Court of Appeals has addressed
the 'substantial relationship' approach and held that while the parties' choice of law is to be given 'heavy weight,'
the law of the state with the 'most significant contacts' is to be applied.") (quoting *Haag v. Barnes*, 175 N.E.2d 441,
444 (N.Y. 1961)); *see also Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("New York
law allows a court to disregard the parties' choice [of law] when the 'most significant contacts' with the matter in
dispute are in another state.") (quoting *Haag*, 175 N.E.2d at 444).  To the extent this standard is meaningfully
different, I will follow the "reasonable relationship" approach more recently articulated by the New York Court of
Appeals in *Welsbach Electric Corp.*

Charlotte, North Carolina, *see* https://www.bofaml.com/content/boaml/en_us/contactus.html.
At least some of the credit card statements were sent to Plaintiff, a New York resident, at her
New York address, with a return address listed in New Jersey.  (Leghorn Decl. Ex. 4.)  Midland
Funding and MCM both have their principal place of business in San Diego, California, (Answer
to AC ¶¶ 6, 8), and Midland Funding listed an address in San Diego, California on the complaint
it filed in City Court of the City of White Plains on May 2, 2011, (Schlanger Decl. Ex. A, at 1).

In 2006, Plaintiff was advised that her "Bank of America credit card account will be
issued and administered by FIA Card Services, N.A," (P's Stmt. & Resp. ¶ 15; Schlanger Decl.
Ex. F), which is a national bank, (P's Stmt. & Resp. ¶ 16).  Defendants asserted in their brief,
without citation to the record, that FIA "reside[s] in Delaware."  (Ds' Mem. 5.)  At oral
argument, Defendants' counsel represented that FIA is a "Delaware national bank," meaning
apparently that its principal place of business is in Delaware.  For support, Defendants' counsel
pointed to an "Assistant Secretary's Certificate of FIA Card Services, National Association"
signed by a Connie B. Smith on January 28, 2010, which states that FIA is "a national banking
association organized and existing under the laws of the United States of America and having its
principal place of business in Wilmington, Delaware." (Doc. 53 Ex. 1.)  This document, which
Defendants did not bother to include in connection with their current motion, does not indicate
where FIA was located in 2006 when it took over Plaintiff's debt.  If it had been in Delaware,
that might be enough to establish a reasonable relationship per *Finucane* (despite the fact that
FIA is not a party to the instant dispute).  In any event, I need not decide whether the principal
place of business of an intermediate creditor suffices to establish a reasonable relationship,
because even if it does, to apply Delaware law would violate a fundamental public policy of New
York, as discussed below.

2. <u>Public Policy</u>

Delaware usury law provides no cap on interest rates, but instead allows interest to be charged in an amount pursuant to the agreement governing the debt. *See* Del. Code Ann. tit. 5 § 943. As discussed above, in New York, the interest recoverable on a defaulted debt is limited to 25% by the criminal usury law. *See Emery*, 570 N.Y.S.2d at 824 (criminal usury law applies to mortgage in default). The difference between Delaware and New York's treatment of interest rates is thus significant.

> [T]he party opposing enforcement of a contractual choice of law . . . bears a "heavy burden" of demonstrating that the foreign law is offensive to [New York's] public policy. This burden is not met by a mere showing that our law is different from that of a sister State. Rather, it must be demonstrated that the applicable foreign law would "violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal."

*Finucane*, 695 N.Y.S.2d at 325 (quoting *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 284-85 (N.Y. 1993)) (citation omitted). In determining whether a foreign law is offensive to New York's public policy, courts should look to "the State's Constitution, statutes and judicial decisions." *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 688 (N.Y. 1985).[8]

A number of cases have applied New York law – despite the parties' choice of another forum's law – because New York's usury prohibition constitutes a fundamental public policy. *See Am. Equities Grp.*, 2004 WL 870260, at *8 ("New York has a strong public policy against interest rates which exceed 25%, which policy must be enforced.") (internal quotation marks omitted); *In re McCorhill Publ'g, Inc.*, 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988) (holding that enforcing New Jersey law would violate New York's "strong public policy against interest rates

---

[8] The public policy exception to enforcement of a choice of law clause applies "only when New York's nexus with the case is substantial enough to threaten our public policy." *Cooney*, 612 N.E.2d at 284. This nexus is satisfied where, as here, a New York domiciliary may be subject to foreign law which violates New York's fundamental public policy. *See id.*

which exceed 25%, which policy must be enforced"); *Assih*, 893 N.Y.S.2d at 446 ("New York has a strong public policy against interest rates which are excessive and this is a policy the courts must enforce."); *Clever Ideas, Inc. v. 999 Rest. Corp.*, No. 0602302/06, 2007 N.Y. Misc. LEXIS 9248, at *2-4 (Sup. Ct. N.Y. Cty. Oct. 12, 2007) (choice of Illinois law not given effect in part because New York's usury prohibition is a fundamental public policy); *N. Am. Bank, Ltd. v. Schulman*, 474 N.Y.S.2d 383, 387 (Cty. Ct. Westchester Cty. 1984) ("[T]he policy underlying our state's usury laws is in fact of a fundamental nature.").

Decisions made in other contexts have also treated the usury prohibition as an important and longstanding public policy of the state of New York.  *See United Mizrahi Bank Ltd. v. Sullivan*, No. 97-CV-9282, 1998 WL 575137, at *8 (S.D.N.Y. Sept. 9, 1998) (New York U.C.C. § 1-102(3) is not a fundamental public policy, while usury prohibition is); *Guerin v. N.Y. Life Ins. Co.*, 62 N.Y.S.2d 805, 810 (1st Dep't 1946) ("Usury is a question of supervening public policy and relates to charges which are in themselves prohibited.").  Indeed, the New York Court of Appeals has recognized that "[t]he purpose of usury laws, *from time immemorial*, has been to protect desperately poor people from the consequences of their own desperation."  *Schneider v. Phelps*, 359 N.E.2d 1361, 1365 (N.Y. 1977) (emphasis added).  New York's usury prohibition is not a creature of recent statute, *see Welsbach Elec. Corp.*, 859 N.E.2d at 503 (prohibition of "pay-if-paid" clauses in construction contracts had "checkered history" and was not clarified until 1995, so was not fundamental public policy), but rather one that reflects a "deep-rooted tradition of the common weal," *Cooney*, 612 N.E.2d at 284.

Further, New York has chosen to make it a felony to charge more than 25% annual interest.  N.Y. Penal Law § 190.40.  That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy.  *See Electrical & Magneto*

*Serv. Co. v. AMBAC Int'l Corp.*, 941 F.2d 660, 663 (8th Cir. 1991) (existence of a criminal provision "is significant because the legislature would not allow a criminal law to be bypassed by the mere existence of a choice of law provision contained in a contract").

Defendants cite only two cases (both federal) finding that New York's usury prohibition does not reflect a fundamental public policy.  (Ds' Mem. 6.)  In *Superior Funding*, the court reasoned that the "'rule of validation' choice of law rule would favor the forum state whose usury statute would most favorably uphold the contract."  *Superior Funding Corp. v. Big Apple Capital Corp.*, 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990) (quoting *Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc.*, 587 F. Supp. 557, 560 (S.D.N.Y. 1982)).  For reasons discussed below, I find that New York courts do not follow such a rule.  In *RMP Capital*, the court did not find New York's usury prohibition to override the parties' choice of Illinois law, which (unlike New York law) prohibits corporations from raising a defense under criminal usury law.  *See RMP Capital Corp. v. BAM Brokerage, Inc.*, 21 F. Supp. 3d 173, 186-87 (E.D.N.Y. 2014).  *RMP Capital* is not analogous because whether or not corporations can raise a usury defense does not seem to be nearly as fundamental a policy as prohibiting usury in the first place. Further, the *RMP Capital* court supported its holding by citing three cases, *Bentley*, No. 02-CV-5714, 2003 WL 22234700, at *3 (S.D.N.Y. Apr. 21, 2003) (report and recommendation), *Superior Funding*, and *Walter E. Heller & Co.*, all of which are unpersuasive here.  *Superior Funding* and *Walter E. Heller & Co.* expressly rely on the "rule of validation" that, again, I find inapplicable, and *Bentley* does not address the public policy inquiry required by *Finucane*. Neither *Superior Funding* nor *RMP Capital* cited any New York state case law, and *RMP Capital* does not address whether New York's usury prohibition constitutes a fundamental public policy of the state.

Even assuming that a reasonable relationship does exist between the parties, the transaction, and Delaware, I agree with Plaintiff that to apply Delaware usury law would violate a fundamental public policy of the state of New York. I will thus apply New York law to Plaintiff's claims.

### 3. The "Rule of Validation"

Defendants argue that New York's "rule of validation" is a separate basis for enforcement of the Delaware choice of law provision. Under such a rule, the court "assumes that the parties intend to enter into a valid contract [and t]hus the forum state chooses the state whose usury statute would sustain the contract in full or else impose the lightest penalty for usury from the set of all states that have a substantial relationship to the contract." *Walter E. Heller & Co.*, 587 F. Supp. at 560. Defendants conclude that the court should look to Delaware because its law is not violated by the interest rate charged.

Despite the Second Circuit's suggestion – referring to the rule of validation – that New York courts "seem[] to follow a special rule with regard to usury," *Speare v. Consolidated Assets Corp.*, 367 F.2d 208, 211 (2d Cir. 1966), the Second Department has since explained that "the Court of Appeals has not articulated a special rule for usury cases," *A. Conner General Contracting Inc. v. Rols Capital Co.*, 535 N.Y.S.2d 420, 422 (2d Dep't 1988); *see also Am. Equities Grp.*, 2004 WL 870260, at *8 ("The rule of validation has, however, been disapproved by New York courts subsequent to the [*Walter E. Heller & Co.*] decision."); *Indus. Dev. Bank of Isr. Ltd. v. Bier*, 565 N.Y.S.2d 980, 984 (Sup. Ct. N.Y. Cty. 1991) (noting Second Department's disapproval of a "special concept for usury cases").[9] Further, the "rule of validation" was

---

[9] In a 1970 Fourth Department case, the court articulated a slightly different rule pertaining to choice of law and usury: "if a contract would be usurious under the general usury statutes of all states to which it has a substantial relationship, the forum will apply the usury statute of that state which imposes the lightest penalty." *Crisafulli v. Childs*, 307 N.Y.S.2d 701, 705 (4th Dep't 1970). The court noted that although such a rule had been followed in

applied "in order to avoid invoking the harsh remedy of forfeiture under the usury laws" of the entire principal and interest. *Indus. Dev. Bank of Isr. Ltd.*, 565 N.Y.S.2d at 983-84. No such risk of forfeiture is present here, where Plaintiff seeks to predicate her FDCPA and GBL claims on New York usury law. Finally, the federal decisions cited by Defendants either explicitly found that, unlike here, application of a foreign state's laws would not violate a fundamental public policy of New York, *see Walter E. Heller & Co.*, 587 F. Supp. at 560 ("Nor should Illinois' law be deemed violative of public policy, since usury is not a favored defense, particularly in the circumstances here where a corporation rather than a helpless consumer is involved."), or did not undertake such an inquiry at all, *see RMP Capital*, 21 F. Supp. 3d at 186-87; *Superior Funding*, 738 F. Supp. at 1471.

Because New York law applies, and Plaintiff predicates her FDCPA and GBL claims on a violation of New York's criminal usury cap, Defendants' motion is denied as to those claims.

## IV. CLASS CERTIFICATION

### A. Rule 23 Standard

In determining whether to certify a putative class, I must apply Federal Rule of Civil Procedure 23. Pursuant to Rule 23(a), class certification is only appropriate where:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Courts have also recognized an implied requirement of ascertainability, *i.e.*, that there be an identifiable class. *See Jeffries v. Pension Trust Fund of Pension,*

---

several decisions, citing *Speare*, "[t]he decisional law as to the applicability of the rule is not unanimous." *Id.* In any event, such a rule would not apply here because Defendants charged interest that would be usurious in New York but legal in Delaware.

*Hospitalization & Benefit Plan of Elec. Indus.*, No. 99-CV-4174, 2007 WL 2454111, at *11, *14 (S.D.N.Y. Aug. 20, 2007) (implied requirement of "ascertainability" requires plaintiff identify existence of aggrieved class); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 336-37 (S.D.N.Y. 2002) ("[A] requirement that there be an identifiable class has been implied by the courts.") (internal quotation marks omitted).

If the requirements of Rule 23(a) are met, I must then determine whether the class is "maintainable" as defined by Rule 23(b).  *See* Fed. R. Civ. P. 23(b); *Jeffries*, 2007 WL 2454111, at *15.  Where a putative class seeks certification pursuant to Rule 23(b)(2), a plaintiff must show that "the party opposing the class has acted or refused to act on grounds that generally apply to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Where a putative class seeks certification pursuant to Rule 23(b)(3), a plaintiff must establish that:  (1) questions of law or fact common to class members predominate over any questions affecting individual members; and (2) the class action device is superior to any other method of adjudication.  *See* Fed. R. Civ. P. 23(b)(3); *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006).

The putative class carries the burden of establishing by a preponderance of the evidence that each of the requirements of Rule 23 is met.  *See Teamsters Local 445 Freight Div. Pension, Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 41.  This determination involves a "'rigorous analysis,'" designed to ensure "'actual, not presumed conformance,'" with Rule 23.  *Initial Pub. Offerings Sec. Litig.*, F.3d at 29 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)).  "[T]he Court's task at the Rule 23 stage is not to resolve the liability question, but to decide 'whether the constituent issues that bear on [Defendants'] ultimate liability are provable in common.'"  *Suvill v. Bogopa*

*Serv. Corp.*, No. 11-CV-3372, 2014 WL 4966029, at *9 (E.D.N.Y. Sept. 30, 2014) (alteration in

original) (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010)).   The district court

has broad discretion in deciding how and whether to certify a class arising from its "inherent

power to manage and control pending litigation."   *Myers*, 624 F.3d at 547 (internal quotation

marks omitted).

## B.  Class Definition

Plaintiff seeks to certify an "umbrella" class defined as:  "(i) all persons residing in New

York; (ii) who were sent a letter by Defendants attempting to collect interest in excess of 25%

per annum; (iii) regarding debts incurred for personal, family, or household purposes."  (P's

Class Cert. Mem. 1.)  There are approximately 49,780 members of this putative class.

(Schlanger Decl. Ex. D.)  Within this umbrella class, Plaintiff identifies three "subclasses":  (1)

for FDCPA violations covering the period from one year prior to the filing of this action through

the date of class certification (the "FDCPA Subclass"); (2) for GBL § 349 violations covering

the period from three years prior to the filing of this action through the date of class certification

(the "GBL Subclass"); and (3) for violations of New York's usury laws covering the period of

one year prior to the filing of this action through the date of class certification.  (P's Class Cert.

Mem. 1.)[10]

"A district court is not bound by the class definition proposed in the complaint, and is

empowered to carve out an appropriate class."  *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D.

221, 229 (S.D.N.Y. 2010) (internal quotation marks omitted), *aff'd sub nom.*, *Charron v. Wiener*,

731 F.3d 241 (2d Cir. 2013).  And "[s]hould it become necessary to modify the class definition

going forward, the Court has discretion to do so."  *Id.* (citing Fed. R. Civ. P. 23(c)(1)).

---

[10] This third subclass has become irrelevant in light of my determination above.

**C.  Rule 23(a)**

   1.  Numerosity

The numerosity element is satisfied where "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "The Second Circuit has determined that numerosity may be presumed with as few as 40 potential class members."  *Leone v. Ashwood Fin., Inc.*, 257 F.R.D. 343, 351 (E.D.N.Y. 2009) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.23d 473, 483 (2d Cir. 1995)).  Here, Defendants sent 49,780 consumers letters seeking interest above 25%, 485 of which resulted in payments in which "the total interest and principal payments exceeds by more than 25% the balance purchased by Midland."  (Schlanger Decl. Ex. D, at 1.)[11]  Counsel for Defendants represented at oral argument that the majority (if not all) of the underlying cardholder agreements purport to be governed by state law that, like Delaware's, provides for no usury cap.  Joinder of even 485 – let alone 49,780 – plaintiffs would be impracticable, which Defendants do not contest.  Plaintiff has satisfied the numerosity requirement.

   2.  Commonality

The commonality requirement requires a showing that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment."  *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008) (alteration in original) (internal quotation marks

---

[11] Defendants sent 49,780 consumers collection letters between November 28, 2008 and June 13, 2012, and 16,500 consumers between November 11, 2010 and November 11, 2011, (*see* Schlanger Decl. Ex. D, at 1), the day after Plaintiff filed this action, (Doc. 1).  It is unclear whether Defendants have continued to send similar collection letters after June 13, 2012, although there is nothing in the record to suggest that they have ceased.  As both subclasses address violations through the date of this opinion, the number of consumers in the class may be even higher than 49,780.

omitted).  "Generally, courts have liberally construed the commonality requirement to mandate a

minimum of one issue common to all class members."  *Toure v. Cent. Parking Sys. of N.Y.*, No.

05-CV-5237, 2007 WL 2872455, at \*6 (S.D.N.Y. Sept. 28, 2007) (internal quotation marks

omitted).  "Consideration of this requirement obligates a district court to determine whether

plaintiffs have 'suffered the same injury.'"  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70,

84 (2d Cir. 2015) (quoting *Dukes*, 564 U.S. at 350).

  Plaintiff maintains that she has met the commonality requirement because "all of the . . .

class members received the same, or similar, form letters from Defendants, seeking to collect

usurious interest."  (P's Class Cert. Mem. 17.)  Plaintiff argues that the common thread uniting

all potential class members is "whether those form letters violate federal and state consumer

protection laws."  (*Id.*)  Plaintiff is correct that each of the putative class members' claims would

turn on the question whether Defendants' form letter violated federal and state law – that is,

whether Defendants were entitled to collect interest at the rate they sought.  While the interest

rate Defendants sought to collect may be readily ascertainable from a review of the "form

letters," that alone will not provide common *answers* to the liability question.  *See Wal-Mart

Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification . . . is not

the raising of common 'questions' – even in droves – but, rather the capacity of a classwide

proceeding to generate common *answers* apt to drive the resolution of the litigation.") (internal

quotation marks omitted).  Defendants' entitlement to collect such a rate depends not simply on

whether Defendants sent a "form letter" to each proposed class member purporting to charge

interest in excess of *New York*'s criminal usury cap, but on whether the applicable state usury

law – which may or may not be New York's – prohibits such an interest rate.  Plaintiff argues

that "it is well-established that choice of law clauses seeking to 'contract around' New York's

usury laws are barred under New York law as violative of fundamental public policy." (Doc. 123 ("P's Class Cert. Reply"), at 1.) Plaintiff misstates the required inquiry. New York law applies where applying the substantive law of another forum would violate a fundamental public policy, not merely because parties tried to "contract around" New York law. *See Finucane*, 264 A.D.2d at 620 ("Th[e] burden is not met by a mere showing that our law is different from that of a sister State."). Indeed, it is conceivable that to apply a different state's laws – one whose usury law is similar but not identical to New York's – would not violate New York's fundamental public policy. *See id.* at 621 ("Oklahoma's more permissive view on indemnification provisions does not violate the fundamental public policy of this State.").[12]

Because the proposed class includes consumers whose debt was issued by creditors other than Bank of America and FIA, commonality turns on whether the putative class members received and agreed to agreements purporting to be governed by the law of a state that, like Delaware, has no usury cap. If a consumer's agreement had a choice of law clause dictating a state with a usury cap of, say 25.1%, the conflict between it and New York might not violate a fundamental New York public policy, and therefore the chosen state's law would (assuming a reasonable relationship) apply, rendering that person's claim not common with Plaintiff's. Where, however, the underlying cardholder agreement purports to be governed by state law that, like Delaware's, provides for no usury cap, application of that state's law will necessarily violate New York's fundamental public policy of prohibiting usury, requiring the application of New York law. *See Finucane*, 264 A.D.2d at 620. Thus my choice of law analysis and finding that New York law governs despite the parties' selection of the Delaware forum – which would apply

---

[12] In that event, the final question would be if there was a reasonable relationship between the chosen forum, the parties, and the transaction.

equally to other states with no usury cap – provides an answer common to resolution of the

claims of the proposed class, *if* that class is narrowed to include only plaintiffs whose debt was

governed by a choice of law clause dictating application of the law of a state that has no usury

cap (or if no law other than New York was selected).[13]  The common injury uniting such a class

would thus be the attempted collection of interest at a usurious rate.  *See Sykes*, 780 F.3d at 84.[14]

I thus narrow the class definition to include:  all persons residing in New York who were

sent a letter by Defendants attempting to collect interest in excess of 25% per annum regarding

debts incurred for personal, family, or household purposes, whose cardholder agreements:  (i)

purport to be governed by the law of a state that, like Delaware's, provides for no usury cap; or

(ii) select no law other than New York.

Citing five "exemplar" cardholder agreements "randomly" selected from the putative

class, Defendants argue that each of them contain a choice of law clause selecting a state that,

---

[13] In the absence of a controlling choice of law provision, New York courts apply the law "of the jurisdiction most intimately concerned with the outcome of the particular litigation." *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 582 (N.Y. 1969) (internal quotation marks and alteration omitted).  In contract cases, "[t]he 'center of gravity;' or 'grouping of contracts' choice of law theory . . . enables the court to identify which law to apply without entering into the difficult, and sometimes inappropriate, policy thicket.  Under this approach, the spectrum of significant contacts . . . may be considered." *Allstate Ins. Co. v. Stolarz*, 613 N.E.2d 936, 939 (N.Y. 1993) (citation omitted).  Here, the consumers reside in New York and presumably incurred debt in New York, and Defendants have chosen to sue consumers, including Plaintiff, in New York courts.  (*See* Schlanger Decl. Ex. A.) New York is the jurisdiction with the most significant contacts to disputes arising out of interest charged on the consumers' debts.  Further, as discussed above, this is a case "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered." *Allstate Ins. Co.*, 613 N.E.2d at 939.  New York's fundamental public policy of prohibiting usury also counsels in favor of applying New York law in the absence of a valid choice of law provision.

[14] Defendants argue that "individual review of each class member's account would be required in order to address . . . whether the terms and conditions were (i) received and (ii) agreed to."  (Doc. 120 ("Ds' Class Cert. Mem."), at 5.)  Defendants cannot have it both ways by arguing that consumers (whose debt Defendants have sought to collect) may dispute the validity of the same terms and conditions under which Defendants' collection efforts were maintained.  In other words, if, as Defendants contend, the terms and conditions entitle them to collect from putative plaintiffs at an interest rate above 25%, Defendants cannot simultaneously question the validity of those terms and conditions.  In any event, Defendants have provided no evidence that any of the proposed class members dispute having received and agreed to the terms and conditions governing their debt.

like Delaware's, provides for no usury cap.  (Ds' Class Cert. Mem. 11-12.)[15]  At oral argument,

counsel for Defendants represented that the majority (if not all) of the underlying cardholder

purport to be governed by state law that, like Delaware's, provides for no usury cap.  Given this

representation, and once the class is narrowed as described above, Plaintiff is correct to point out

that this argument cuts in favor of commonality, not against.  (P's Class Cert. Reply 10.)

Plaintiff has shown that the class mechanism would generate common answers to the choice of

law question, which, as discussed above, drives liability.  She has satisfied the commonality

requirement.

3. Typicality

Typicality is satisfied if "each class member's claim arises from the same course of

events, and each class member makes similar legal arguments to prove the defendant's liability."

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001).  "A named

plaintiff's claim is 'typical' under Rule 23(a)(3) if it arises from the same event or course of

conduct that gives rise to claims of other class members and the claims are based on the same

legal theory."  *Jeffries*, 2007 WL 2454111, at *12 (internal quotation marks omitted).

"The commonality requirement . . . tests the definition of the class itself, while the

typicality requirement focuses on how the named plaintiff s claims compare to the claims of the

other class members."  *Traver v. Lowe's Home Ctrs., LLC*, No. 12-CV-3528, 2016 WL 880169,

at *2 (E.D.N.Y. Mar. 1, 2016) (internal quotation marks omitted).  Though courts often discuss

the commonality and typicality requirements together, *see In re Telik, Inc. Securities Litigation*,

576 F. Supp. 2d 570, 582 (S.D.N.Y. 2008) (collecting cases); *Marisol A. v. Giuliani*, 126 F.3d

---

[15] According to Plaintiff, Defendants did not disclose these documents during discovery.  (P's Class Cert. Reply 7.)
In addition, despite my instructions on the previous motion, Defendants have again failed to properly authenticate
these "exemplar" cardholder agreements.  Even if they were properly considered on this motion, however, they do
not help Defendants' position.

372, 376 (2d Cir. 1997) ("The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rule 23(a)(2) and (3)."), "[t]he typicality element is distinct from commonality in that typicality focuses on '*claims or defenses*,' rather than on 'questions of law or fact,'" *Lemire v. Wolpoff & Abramson, LLP*, 256 F.R.D. 321, 326 (D. Conn. 2009) (quoting Fed. R. Civ. P. 23(a)).

"It is well established . . . that typicality does not require identical facts," *id.* at 327 (internal quotation marks omitted), and also does not require that damages be identical among class members, s*ee Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 337 (E.D.N.Y. 2013) ("[I]ndividualized proof of damages alone will not defeat class certification.") (internal quotation marks omitted).

Typicality is not met "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Vincent v. Money Store*, 304 F.R.D. 446, 455 (S.D.N.Y. 2015). But the so-called "unique defense rule . . . is not rigidly applied in this Circuit," *In re Parmalat Sec. Litig.*, No. 04-CV-30, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (internal quotation marks omitted), and when it is applied, it is generally to protect a plaintiff class rather than to "shield defendants from a potentially meritorious suit and . . . only where a full defense is available against an individual plaintiff's action," *id.* (internal quotation marks omitted). Defendants have not suggested a defense unique to Plaintiff. I have already rejected Defendants' argument that Delaware law applies and permits the interest Defendants sought despite New York's criminal usury cap, so that defense is not a barrier to finding typicality among a class of plaintiffs whose agreements called for application of the law of a state with no usury cap.

Defendants argue that because Plaintiff did not actually make any payments pursuant to Defendants' letter, her claims are not typical of the proposed class.  (Ds' Class Cert. Mem. 10-11.)  "[S]ince the violation alleged here – the 'core' of the damages suffered – is the illegal debt collection attempt, whether or not the plaintiff paid and suffered actual damages does not affect [her] typicality as a class representative."  *Annunziato v.*, 293 F.R.D. at 338 (E.D.N.Y. 2013) (internal quotation marks omitted) (collecting cases).  Plaintiff has thus shown that her claims are typical of the proposed class.

### 4. Adequacy

Rule 23(a)(4) requires that Plaintiff show she "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997).  The adequacy inquiry "'is twofold:  the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.'"  *Pichardo v. Carmine's Broadway Feast Inc.*, No. 15-CV-3312, 2016 WL 5338551, at *5 (S.D.N.Y. Sept. 23, 2016) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).  "A conflict or potential conflict alone will not, however, necessarily defeat class certification – the conflict must be fundamental."  *Denney*, 443 F.3d at 268 (internal quotation marks omitted).  In addition, "class counsel must be qualified, experienced and generally able to conduct the litigation."  *Vincent*, 304 F.R.D. at 456 (internal quotation marks omitted).

Defendants do not appear to challenge the adequacy of Plaintiff's counsel in representing the proposed class.  Indeed, Mr. Schlanger and Mr. Bragg have extensive experience

representing consumers in connection with federal and state consumer protection statutes, including the FDCPA.  (*See* Doc. 100 ¶¶ 8-11; Doc. 104 ¶¶ 4, 6, 14.)

Defendants make two main arguments attacking Plaintiff's adequacy as a class representative:  first, that because her claims fail as a result of the Delaware choice of law clause, she is not a member of the purported class; and second, that because Plaintiff did not actually make any payments following receipt of Defendants' collection letter, she cannot represent those putative class members who did.  (*See* Ds' Class Cert. Mem. 9-11.)  Defendants' first argument fails because, as discussed above, New York law applies to Plaintiff's claims, and she is thus a member of the putative class.  Defendants' second argument fails because, as discussed under the typicality analysis, the fact that Plaintiff did not suffer actual damages does not prevent her from representing those class members who did.  *See Petrolito v. Arrow Fin. Servs., LLC*, 221 F.R.D. 303, 310 (D. Conn. 2004) ("[W]hether or not the plaintiff paid and suffered actual damages does not affect his typicality as a class representative."); *see also Keele v. Wexler*, 149 F.3d 589, 593-94 (7th Cir. 1998) ("[T]he [FDCPA] is blind when it comes to distinguishing between plaintiffs who have suffered actual damages and those who have not.  So long as [Plaintiff's] and the class members' injuries arose out of the same violative conduct, she may properly represent [the class.]").  Moreover, as noted above, only 485 of the 49,870 putative class members actually paid usurious interest in response to Defendants' demands, (Schlanger Decl. Ex. D, at 1), so over 99% of class members, like Plaintiff, would be seeking only statutory damages.  Accordingly, Plaintiff has met the adequacy requirement.

  5.  Ascertainability

The additional requirement of ascertainability is met when the class is "readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling."

*McBean v. City of N.Y.*, 260 F.R.D. 120, 132-33 (S.D.N.Y. 2009). Here, the class is defined by objective criteria – by the residence of each putative class member, the choice of law clause contained on the face of the underlying cardholder agreement, when and whether Defendants sent each putative class member a collection letter, and the interest rate on the face of such a letter. The Court will thus be able to readily identify class members without requiring a "mini-hearing on the merits of each case." *Charron*, 269 F.R.D. at 229 (internal quotation marks omitted).

**D. Rule 23(b)**

Given that the proposed class as narrowed meets the Rule 23(a) threshold requirements, Plaintiff must show that the proposed class "is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc.*, 521 U.S. at 614.

Plaintiff seeks to certify a hybrid class under both Rule 23(b)(2) and (b)(3). On behalf of the proposed (b)(2) class, Plaintiff seeks a declaration that "Defendants' collection and attempted collection of interest at a rate in excess of 25% [violates] New York General Obligations Law and thereby violate[s] the FDCPA and New York GBL § 349" and an injunction to prevent Defendants from attempting to collect such interest rates in the future. (P's Class Cert. Mem. 24.) On behalf of the (b)(3) class, Plaintiff seeks " actual and statutory damages," based on the same alleged violations. (*Id.* at 25.) Both equitable relief and monetary damages are central to Plaintiff's case – she seeks redress for FDCPA violations as well as injunctive relief to prevent Defendants from engaging in the same violative conduct moving forward.

Certification of a 23(b)(2) class alone is inappropriate where, as here, "'the monetary relief is not incidental to the injunctive or declaratory relief.'" *Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26, 29 (2d Cir. 2012) (summary order) (quoting *Dukes*, 564 U.S. at 359);

*see Charron*, 269 F.R.D. at 237 ("Where, as here, a class seeks injunctive relief and significant monetary damages, due process concerns militate strongly against maintaining a mandatory (b)(2) class action without the procedural safeguards of notice and the opportunity to opt-out that are provided to members of a (b)(3) damages class.").  This leaves open three options:

> The court may "certify[] the class under Rule 23(b)(3) for all proceedings," "certify a Rule 23(b)(2) class for the portion of the case addressing equitable relief and a Rule 23(b)(3) class for the portion of the case addressing damages," or "certify the class under Rule 23(b)(2) for both monetary and equitable remedies but exercise its plenary authority under Rules 23(d)(2) and 23(d)(5) to provide the class members with personal notice and opportunity to opt out, as though the class was certified under Rule 23(b)(3)."

*Casale v. Kelly*, 257 F.R.D. 396, 408 (S.D.N.Y. 2008) (quoting *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 581-82 (7th Cir. 2000)); *see Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 288-89 (S.D.N.Y. 2012) (setting forth same three options), *aff'd*, 780 F.3d 70, 84 (2d Cir. 2015).  Given that both equitable relief and damages are central to Plaintiff's claims, I will address whether Plaintiff's proposed class is maintainable under both (b)(2) and (b)(3).

### 1.  23(b)(2) – Injunctive Class

Rule 23(b)(2) provides that a class maybe maintained thereunder if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  The proposed class has been redefined as:  all persons residing in New York who were sent a letter by Defendants attempting to collect interest in excess of 25% per annum regarding debts incurred for personal, family, or household purposes, whose cardholder agreements:  (i) purport to be governed by the law of a state that, like Delaware's, provides for no usury cap; or (ii) select no law other than New York.

37

Plaintiff seeks a declaration that "Defendants' collection and attempted collection of interest at a rate in excess of 25%" violates New York law and therefore the FDCPA and the GBL, and an injunction preventing Defendants from attempting such collections in the future. (P's Class Cert. Mem. 24.)  Injunctive or declaratory relief, however, is not available under the FDCPA.  *See Sykes*, 285 F.R.D. at 293 ("[N]either injunctive nor declaratory relief is available under the FDCPA . . . ."); *Sparkman v. Zwicker & Assocs., P.C.*, 374 F. Supp. 2d 293, 298-99 (E.D.N.Y. 2005) ("equitable relief is not available to private litigants" under FDCPA); *see also Hecht v. United Collection Bureau, Inc.*, 691 F.3d 218, 223 n.1 (2d Cir. 2012) ("We do not here decide whether the FDCPA permits private plaintiffs to seek injunctive relief because the issue is not squarely presented, but we note that every federal appeals court to have considered the question has held that it does not.").  The proposed (b)(2) class will thus be limited to include only the GBL Subclass.  *See Sykes*, 285 F.R.D. at 293.

I find that this proposed class meets the requirements of Rule 23(b)(2).  First, this injunctive relief and corresponding declaratory relief will benefit the entire class – those who have received a collection letter in the past are at risk of receiving continued collection attempts, and Defendants do not argue that any of these proposed class members have settled their debt or would otherwise be protected against collection attempts, and so would not benefit from the requested injunctive relief.  Further, all class members have been subjected (or will be subjected) to Defendants' attempts to collect an interest rate not permitted by New York law, and would thus, if successful, benefit from injunctive relief preventing Defendants from making subsequent attempts.  *See Charron*, 269 F.R.D. at 236 (class members "have been subjected to and/or are at risk of being subjected to Defendants' alleged tactics, and would benefit from such relief if the allegations are true").

Second, Defendants have "act[ed] on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). By definition, Defendants sent each member of the putative class a letter seeking to collect interest at a rate above 25%. (*See* Schlanger Decl. Ex. D).

Defendants, citing *Dukes*, argue that Plaintiff's request for monetary damages that "are specific to each individual and would . . . require individual review on a case-by-case basis" prevents certification of a Rule 23(b)(2) class. (Ds' Class Cert. Mem. 12). *Dukes* held that Rule 23(b)(2) allows certification "only when a single injunction or declaratory judgment would provide relief to each member of the class," and that where class members seek individualized injunctions or damages, (b)(2) is inappropriate. 564 U.S. at 360-61. Assuming Defendants are correct that determining damages will require individualized review for that small portion of the class that made payments at a usurious rate, certification of a parallel 23(b)(3) class to address that monetary relief "avoids the due process concerns raised by the inclusion of monetary relief under the framework of a (b)(2) class." *Casale*, 257 F.R.D. at 413 n.123; *see Sykes*, 285 F.R.D. at 293 ("That plaintiffs are seeking substantial monetary damages is of no concern given the Court's certification of separate Rule 23(b)(2) and (b)(3) classes addressing equitable relief and damages, respectively."). Plaintiff's proposed (b)(2) class does not seek damages at all; it seeks only equitable relief that is identical for all class members. I find that the proposed (b)(2) class satisfies the requirements of Rule 23(b)(2).

2. 23(b)(3) – Damages Class

To certify a separate damages class, Plaintiff must meet both the predominance and superiority requirements of Rule 23(b)(3). *See Sykes*, 285 F.R.D. at 288 (citing Fed. R. Civ. P. 23(b)(3)).

a. *Predominance*

"To satisfy the predominance requirement, the issues subject to generalized proof and applicable to the class as a whole must predominate over, and be more substantial than, the issues that are subject to individualized proof." *Vincent*, 304 F.R.D. at 460. "With respect to common issues, Rule 23(b)(3), by its plain terms, imposes a 'far more demanding' inquiry into the common issues which serve as the basis for class certification." *Sykes*, 780 F.3d at 81 (quoting *Amchem Prods., Inc.*, 521 U.S. at 623-24). "The mere existence of individual issues will not be sufficient to defeat certification. Rather the balance must tip such that these individual issues predominate." *Id.* at 87. Finally, "common issues may predominate when liability can be determined on a class-wide basis, even where there are individualized damage issues." *Id.* at 81 (internal quotation marks omitted); *see Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015) ("[I]ndividualized damages determinations alone cannot preclude certification under Rule 23(b)(3), and cannot support the district court's denial of Plaintiffs' motion for certification.") (citation omitted).

Defendants argue that Plaintiff fails to establish predominance for the same reason she fails to establish commonality – that "individual review is necessary to determine whether each debtor *in this case* agreed to be bound by terms and conditions permitting the law of another state allowing rates in excess of 25 percent." (Ds' Class Cert. Mem. 8 (emphasis in original).) As discussed above, such individualized review is not required. I have narrowed the class so that it encompasses only debtors whose cardholder agreements purport to be governed by state law that, like Delaware law, provides no usury cap (or whose agreements did not dictate application of the law of a state other than New York). Defendants have represented through counsel that most, if not all, class members' agreements pointed to a state with no usury cap. Thus the choice

of law inquiry for all of those class members will be identical to the one for Plaintiff, and will result in the application of New York law.  And for those class members who did not agree to a cardholder agreement selecting another state's law, New York law will govern in such an agreement's absence.  Defendants have thus not identified any issues requiring individualized inquiry, and Plaintiff has established that common issues predominate over individual ones.

As to damages, to the extent the (b)(3) class seeks statutory damages under GBL § 349, they "can be assessed on the basis of common proof, as they are capped at $50."  *Sykes*, 780 F.3d at 87 (quoting N.Y. Gen. Bus. Law § 349(h)).  Further, "Congress has devised a generally applicable formula for class action damages under the FDCPA, one which caps damages at $500,000 and provides that district courts consider, among other factors, the scope of the violations of the FDCPA as well as the number of individuals implicated by fraudulent debt collection practices."  *Id.* at 87-88 (citing 15 U.S.C. § 1692k(b)(2)).  While determining the actual damages incurred by the 485 class members who made payments pursuant to a usurious interest rate may require a certain amount of individualized review, this "does not preclude a finding of predominance under Rule 23(b)(3)."  *Id.* at 87 (internal quotation marks omitted); *see Roach*, 778 F.3d at 409 (predominance does not require damages to be measurable on classwide basis).

b. *Superiority*

To satisfy the superiority requirement of 23(b)(3), Plaintiff "must also show 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'"  *Vincent*, 304 F.R.D. at 462 (quoting Fed. R. Civ. P. 23(b)(3)).  "Rule 23(b)(3) . . . lists four factors – individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability – which courts should consider in making these

determinations." *Sykes*, 780 F.3d at 82.  While these factors "seem to apply both to the predominance and superiority inquiry, . . . they more clearly implicate the superiority inquiry." *Id.*

"[M]anageability is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication.  As a component of manageability, in determining whether a class action in a particular forum is a superior method of adjudication, courts have considered when a particular forum is more geographically convenient for the parties or, for example, when the defendant is located in the forum state." *Id.* (internal quotation marks and omission omitted).

Defendants make only a cursory attempt to defeat superiority here, arguing that "[a]s each case would require individual review the claims of these putative class members would be better served in separate actions."  (Ds' Class Cert. Mem. 13.)  But class action suits brought under the FDCPA "regularly satisfy the superiority requirement of Rule 23."  *In re Risk Mgmt. Alts., Inc., Fair Debt Collection Practices Act Litig.*, 208 F.R.D. 493, 507 (S.D.N.Y. 2002). Defendants cannot dispute that the class action will be a more efficient mechanism than thousands of individual suits.  *See Sykes*, 285 F.R.D. at 294.  Nor can they dispute that "class members' interest in litigating separate actions is likely minimal given their potentially limited means with which to do so and the prospect of relatively small recovery."  *Sykes*, 780 F.3d at 93 (internal quotation marks and alteration omitted).  Defendants have not pointed to any other prior or ongoing litigation between the parties.  All class members reside in New York, and Defendants have not argued that this forum is unsuitable in any way.  Defendants have also not identified any manageability issues that would be "beyond the realm of the 'management tools' the Court has at its disposal."  *Sykes*, 285 F.R.D. at 294 (quoting *In re Visa Check/MasterMoney*

*Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001).  Plaintiff has thus established the superiority of class adjudication.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to Plaintiff's § 5-501 and § 190.40 claims, and DENIED as to Plaintiff's FDCPA and GBL § 349 claims.  Plaintiff's motion for class certification as modified above is GRANTED.   Accordingly, the Court certifies:

1.   A Rule 23(b)(2) injunctive and declaratory relief class comprising all persons residing in New York who were sent a letter by Defendants attempting to collect interest in excess of 25% per annum regarding debts incurred for personal, family, or household purposes, whose cardholder agreements:  (i) purport to be governed by the law of a state that, like Delaware's, provides for no usury cap; or (ii) select no law other than New York.  This class covers only claims arising out of GBL violations from November 10, 2008 through today's date.

2.   A Rule 23(b)(3) damages class comprising all persons residing in New York who were sent a letter by Defendants attempting to collect interest in excess of 25% per annum regarding debts incurred for personal, family, or household purposes, whose cardholder agreements:  (i) purport to be governed by the law of a state that, like Delaware's, provides for no usury cap; or (ii) select no law other than New York.  This class comprises two subclasses:  (a) for claims arising out of GBL violations from November 10, 2008 through today's date; and (b) for claims arising out of FDCPA violations from November 10, 2010 through today's date.

The Clerk of Court shall terminate the pending motions.  (Docs. 99, 112.)  The parties shall appear for a conference on March 8, 2017 at 3:00 PM.

**SO ORDERED.**

Dated: February 27, 2017
          White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.